FILED by GME D.C.
INTAKE

OCT 0 1 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____ -CIV-___

## 09-22964



CIV-KING

MAGISTRATE JUDGE
BANDSTRA

DOLPHIN DIGITAL MEDIA, INC., a
Nevada corporation, DOLPHIN
ENTERTAINMENT, INC., a Florida
corporation and DOLPHIN
ENTERTAINMENT CAPITAL, INC.,
a Delaware corporation,

        Plaintiffs,

vs.

MARK PEIKIN, an individual,
JOSHUA GOLD, an individual,
BESPOKE GROWTH PARTNERS, INC.,
a Florida corporation,  GSQUARED, LTD.,
a Rhode Island corporation, CARTA DE
DINERO, LLC, a California corporation,
NEVADA AGENCY AND TRANSFER CO.,
a Nevada corporation and  MERRILL
LYNCH PIERCE FENNER & SMITH,
a Delaware corporation,

        Defendants.

_____/

## VERIFIED COMPLAINT

Plaintiffs Dolphin Digital Media, Inc. ("**DDM**"), Dolphin Entertainment, Inc. ("**DEI**")

and Dolphin Entertainment Capital, Inc. ("**DEC**") (collectively, the "**Dolphin Companies**")

hereby sue Defendants Mark Peikin ("**Peikin**"), Joshua Gold ("**Gold**"), Bespoke Growth

Partners, Inc. ("**Bespoke**"), GSquared, Ltd. ("**GSquared**"), Carta De Dinero, LLC ("**Carta**"),

Merrill Lynch Pierce Fenner & Smith, Inc. ("**Merrill Lynch**") and Nevada Agency And Transfer

Co. ("**NATCO**") and allege, as follows:

## JURISDICTION AND VENUE

1.      DDM is a corporation organized and existing under the laws of the State of Nevada, but which maintains its principal place of business in Coral Gables, Miami-Dade County, Florida.  It is a public company with stock trading on the Over-The-Counter Bulletin Board (symbol DPDM).

2.      DEI is a corporation organized and existing under the laws of the State of Florida, is a citizen thereof and which maintains its principal place of business in Coral Gables, Miami-Dade County, Florida.

3.      DEC is a corporation organized and existing under the laws of the State of Delaware, is a citizen thereof and which maintains its principal place of business in Coral Gables, Miami-Dade County, Florida.

4.      Peikin is a citizen of the State of Florida and resides in Broward County, Florida.

5.      Gold is a citizen of the State of Florida and resides in Broward County, Florida.

6.      Bespoke is a corporation organized and existing under the laws of the State of Delaware, is a citizen of Florida and maintains its principal place of business in Broward County, Coral Springs, Florida.

7.      GSquared is a corporation organized and existing under the laws of the State of Delaware, is a citizen of Rhode Island and maintains its principal place of business in Pawtucket, Rhode Island.

8.      Carta De Dinero is a corporation organized and existing under the laws of the State of California, is a citizen thereof and which maintains its principal place of business in Los Angeles, California.

ABADIN COOK     DADELAND CENTRE,   SUITE 1208,   9155 SOUTH DADELAND BLVD.,   MIAMI, FL 33156
TELEPHONE: 305-670-4777 X2224 OR 2237     DIRECT FAX: 305-437-8144 OR 305-503-6794   EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

9.     Merrill Lynch is a corporation organized and existing under the laws of the State of Delaware, but is a citizen of and maintains its principal place of business in New York, New York.

10.     NATCO is a corporation organized and existing under the laws of the State of Nevada with its principal place of business in Reno, Nevada.

11.     This Court obtains subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and otherwise known as "federal question jurisdiction," as count I hereof is a claim predicated in Defendants' violation of 18 U.S.C. §§1962 and 1964, the civil private enforcement provisions of the Racketeer Influenced Corrupt Organizations Act ("**RICO**").   This Court obtains subject-matter jurisdiction over the remaining claims alleged herein, pursuant to 28 U.S.C. §1367(a).

12.     This Court is the proper venue for the hearing and disposition of this suit, pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this district.

## COMMON FACTUAL ALLEGATIONS

### The Parties.

13.     DDM, formerly Logica Holdings, Inc. ("**Logica**"), creates and manages social networking websites for children and young adults utilizing state-of-the-art fingerprint identification technology.   Its present corporate incarnation is the result of a merger in 2008, which merger was presided over by Peikin and Gold, who acted as counsel for all parties to the transaction.

3

Dolphin Digital Media, Inc., *et. al*. v. Peikin, *et. al*.
Complaint, Case No. _____

14.     DEI is one of the world's leading entertainment companies specializing in children's and young adult live-action programming and is the owner of various intellectual property rights to live-action television and movie productions and related licensing and merchandising rights.  By written agreement, such rights are licensed to DDM for use in its social networking websites for children.

15.     DEC is in the business of strategic financing, investor relations and the formation of financial partnerships to fund the productions of DEI and third-parties.

16.     Peikin is an attorney licensed to practice law in New York and Massachusetts.

17.     Gold is an attorney licensed to practice law in Massachusetts.

**The Introduction To Peikin.**

18.     On June 24, 2007, DEI's president and principal shareholder, William O'Dowd IV, Esq. ("**O'Dowd**"), was introduced to Peikin by a merchandising agent with whom DEI was associated.

19.     At the time of the introduction, Peikin was employed by Hodgson Russ, LLP ("**Hodgson Russ**") in its New York, New York office and represented that his legal work focused on representing companies and ventures in the entertainment industry.

20.     On or about July 13, 2007, DEI retained Peikin and Hodgson Russ to handle the company's legal work related to the structuring of its debt facilities for the anticipated production of its feature film slate.

21.     On November 28, 2007, Peikin advised DEI that he intended to relocate his practice to the Manhattan office of Brown Rudnick LLP ("**Brown Rudnick**"), where he would allegedly head the firm's digital/entertainment practice group.

4

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

22.     Peikin wanted to continue to work with DEI at Brown Rudnick and requested that DEI terminate its use of Hodgson Russ and move its legal work to Peikin's new firm. DEI obliged and on or about November 30, 2007, DEI retained Peikin and Brown Rudnick to represent its interests in connection with the company's feature film slate and other related legal matters.

### The Logica Merger.

23.     In March 2008, Logica was a corporation organized under the laws of the state of Nevada and whose business was the development and commercialization of software platforms which could be used by third parties to create and operate private branded on-line social networking websites. At that time, Logica was looking for new legal representation and came in contact with Peikin at Brown Rudnick.

24.     Peikin sought to include Logica in his stable of clients and, after meeting with its principals, requested O'Dowd speak to the principals of Logica and recommend Peikin's retention as counsel. O'Dowd obliged.

25.     After securing Logica as a client, Peikin then set about trying to get DEI and Logica to work together. Peikin requested O'Dowd to meet with Logica's principal and personally examine Logica's technology to confirm its compatibility with DEI's objectives. As a result of his efforts, Peikin coordinated and set-up a meeting between DEI and Logica on April 22, 2007, and such meeting produced a contemplated working relationship between DEI and Logica.

26.     Peikin sought to coordinate and document the terms of the parties' contemplated relationship. Rather than procure separate counsel for either DEI or Logica for their negotiations

5

and contract preparation, Peikin prepared a generic and non-specific conflict of interest waiver so that he could represent both parties.  A copy of the waiver is attached hereto as Exhibit "**A**."  The waiver was not prepared on Brown Rudnick letterhead and was limited in its scope to the negotiation of a contemplated license agreement and promotion of Logica's future on-line social networks.

27.     After further meetings and negotiations between DEI and Logica, which meetings were facilitated by Peikin, the companies came to a tentative agreement to enter into a Merger and Stock Purchase Agreement, wherein O'Dowd would create a new entity, Dolphin Digital Delaware, Inc. that would be merged with Logica.  O'Dowd would become the majority shareholder of the surviving entity.  Peikin represented all parties to the merger and, accordingly, worked on both sides of the transaction but did not procure an updated conflict of interest waiver.

28.     At or about the time of DEI's introduction to Logica, Gold was an associate in Brown Rudnick's Boston, Massachusetts office.  Shortly after joining Brown Rudnick, Peikin began working directly with Gold and used Gold's time and skills to represent Peikin's clients.  Accordingly, Gold was one of Brown Rudnick's attorneys who helped Peikin to negotiate and document the merger between DDD and Logica.

29.     The merger was concluded on June 23, 2008 with DDM in its present form emerging as the surviving business entity.

### Peikin and Gold Join the Dolphin Companies.

30.     After the merger, Peikin and Gold continued with their representation of DEI and DDM and assumed control of all of the corporations' legal matters.

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

31.  Accordingly, on December 2, 2008, DDM issued a press release wherein it announced that it had retained the services of Brown Rudnick to represent the Dolphin Companies as its general counsel. The press release also advised that Peikin would serve as lead attorney. Peikin is quoted in the press release, as follows:

> We are excited to be representing the interests of Dolphin Digital Media," said attorney Mark Peikin. "We believe the Company has an extremely promising future, and look forward to continuing our successful relationship with the Dolphin family of brands."

A copy of the press release is attached hereto as Exhibit "**B**."

32.  On December 26, 2008, Peikin met with O'Dowd at the offices of the Dolphin Companies. During the meeting, Peikin expressed dissatisfaction with his employment as an attorney and represented that, by coming to work with the Dolphin Companies, he could make them significantly more profitable.

33.  On January 3, 2009, Peikin again met with O'Dowd at the offices of the Dolphin Companies. During the meeting, Peikin expanded on his prior representation by stating that he could increase revenue by forming a separate entity that would be exclusively responsible for seeking out the financing opportunities for DEI, that would otherwise be able to structure financing for selected third parties and in which Peikin would serve as president and obtain one-half of the shares to be issued. As part of his proposal, Peikin represented that the new entity would be cash flow positive within sixty (60) days of its founding, that it would generate more than $1,000,000.00 its first year in operation and that Peikin could establish a proprietary fund of no less than $10,000,000.00 for the acquisition of films from third parties.

34.  As a result of these meetings, DEI and O'Dowd elected to hire Peikin and Peikin prepared his own written employment offer. A copy of the letter is attached hereto as Exhibit

7

"**C.**" Therein, Peikin was offered the position of general counsel to DEI and the presidency and fifty-percent (50%) share ownership of DEC, a company to be formed expressly because of Peikin's prior representations.

35.     Peikin commenced employment with DEI on February 1, 2009 and DEC was formed on February 6, 2009.

36.     As part of his campaign to obtain employment with the Dolphin Companies, Peikin sought to include Gold. After some discussion and meetings with Gold in January 2009 at Peikin's urging, DDM offered Gold the positions of associate general counsel and chief compliance officer.

37.     Although he accepted the offer of employment, Gold advised DDM that he required more time to end his employment at Brown Rudnick and would be unavailable to start until March 15, 2009.

38.     Shortly before March 15, 2009, Peikin contacted DDM to advise that Gold was financially unable to relocate his family to Florida from Rhode Island. Ultimately, DDM agreed to pay Gold $20,000.00 as a "signing bonus" and to cover the costs of relocation.

39.     After making this arrangement, Gold then advised DDM that he did not want to begin work on March 15, 2009 at DDM's Miami, Florida office. Instead, he wanted to continue to work from Rhode Island until June 2009, ostensibly so that Gold's step-son could complete the academic year at his school. In fact, Gold continued to report to work at Brown Rudnick and serve as an attorney for the firm, unbeknownst to O'Dowd and DDM.

40.     Peikin also sought to avoid working out of the Dolphin Companies' Miami, Florida office until June 2009, claiming that he would need to travel several times in the upcoming months for work.

41.     DDM acceded to Peikin' and Gold's request to delay their move to Florida.

42.     By June 2009, although Peikin and Gold allegedly moved to Coral Springs, Florida, they did not come to work out of the offices of the Dolphin Companies.   When confronted by O'Dowd with the need to work from the offices, Peikin and Gold repeatedly assured him that they needed only another week to settle their various personal and family obligations pending back in New Jersey and Rhode Island, respectively.

**Peikin and Gold Disappear.**

43.     By July 2009, five (5) months after the commencement of his employment, Peikin had failed to secure any clients for the Dolphin Companies or deliver on any of the other promises of financial gain he made to secure his employment.  Accordingly, O'Dowd scheduled a meeting with Peikin for July 18, 2009 to discuss Peikin's failures and how to improve results in the future.

44.     Because O'Dowd was traveling back to Miami, Florida from Los Angeles, California on July 18, 2009, and such travel was delayed, O'Dowd was unable to meet with Peikin, as scheduled.  O'Dowd and Peikin, however, agreed that they would speak on July 20, 2009 because Peikin needed to travel on July 19, 2009.

45.     On July 19, 2009, O'Dowd met with Gold because Gold reported that he desperately needed his paycheck and an additional (2) days to align his personal affairs before he could begin working at the offices of the Dolphin Companies.

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

46.     At the meeting, O'Dowd questioned Gold as to where Peikin was and where he had traveled to. Gold claimed that he did not know where Peikin was.

47.     On July 20, 2009, Peikin failed to make contact of any kind with O'Dowd. Despite multiple efforts each day thereafter to contact Peikin, O'Dowd was unable to reach him.

48.     On July 21, 2009, O'Dowd called Gold to discuss DDM business when he discerned that Gold was in an airport. When questioned about whether he was traveling and why he failed to previously mention it to O'Dowd, Gold confessed that he was traveling, allegedly to Rhode Island, to attend to urgent and unexpected family business. Gold claimed he would return from his travels promptly and begin work at the Dolphin Companies' offices on July 24, 2009.

49.     As with Peikin, O'Dowd's numerous subsequent attempts to communicate with Gold went unanswered.

50.     On July 24, 2009, Peikin and Gold simultaneously resigned from their respective positions with the Dolphin Companies. A copy of the letters sent by their counsel are attached hereto as Composite Exhibit "**D**."

51.     Subsequent to their resignations, the Dolphin Companies discovered and learned of the various schemes and efforts devised by Peikin and Gold by which they intended to profit from and use the Dolphin Companies as a front for their personal endeavors.

**The Bespoke Scheme**

52.     On March 20, 2009, Peikin and Gold formed Bespoke. They appointed themselves to all of the officership and directors' positions and commenced business in direct competition with DEC to provide strategic advice for businesses seeking financing. The formation, existence and business of Bespoke were not disclosed to the Dolphin Companies.

10

53.     In his capacity as president, director and fifty-percent (50%) shareholder of DEC, Peikin was charged with the responsibility for seeking out financing and investment opportunities that would allow DEI to develop and produce its programming and other ventures. Accordingly, Peikin attended meetings, conventions and expended corporate resources in furtherance thereof.

54.     Peikin, however, did not use the meetings and convention attendances as opportunities to promote the business of any of the Dolphin Companies. Instead, he expended DEC's resources to seek opportunities for Bespoke in direct contravention of and competition with the aims of the Dolphin Companies without their knowledge. As a result of his preoccupation with a competing venture and dereliction of his obligations to the Dolphin Companies, Peikin procured no deals and obtained no financing for any of the Dolphin Companies' projects.

55.     To the contrary, on June 11, 2009, Peikin attended a venture capital and private equity conference in his capacity as DEC's president. Rather than promote DEC's business interests and attempt to secure financing for DEI's projects at the conference, Peikin promoted and acted on behalf of Bespoke's interests. He even prepared and distributed a presentation and promotional materials at the convention to prospective investors and partners. A copy of the presentation is attached hereto as Exhibit "**E**."

**The Rite Solutions Scheme.**

56.     After DDM secured Logica's software in the merger, it commenced development of its intended on-line environment but determined after a few months that Logica's platform was insufficient for and incompatible with the planned parameters of DDM's projects.

**ABADIN COOK**   DADELAND CENTRE,   SUITE 1208,   9155 SOUTH DADELAND BLVD.,   MIAMI, FL 33156
TELEPHONE: 305-670-4777 x2224 OR 2237   DIRECT FAX: 305-437-8144 OR 305-503-6794   EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

Accordingly, DDM sought out outside vendors it could partner with to host and maintain its platform once it was developed.

57.    In the course of DDM's efforts to locate an appropriate partner, Gold recommended Rite Solutions, Inc. ("**Rite Solutions**"), a company that provides systems engineering and offers internet hosting capabilities. Gold was personally acquainted with one (1) or more members of the company's management.

58.    On May 8, 2009, DDM met with Rite Solutions at its place of business in Rhode Island to discuss the possibility of forming a working relationship. Peikin and Gold were present at the meeting and were acting at such meeting as representatives and fiduciaries of the Dolphin Companies. After O'Dowd left the meeting, Peikin and Gold attempted to secure a finder's fee for themselves from Rite Solutions for making the introduction to DDM. Moreover, they offered Bespoke to Rite Solutions as a contractual partner that could make other profitable introductions.

59.    To that end, on May 12, 2009, Peikin and Gold continued their communication with representatives of Rite Solutions to secure a commission arrangement for themselves and Bespoke without disclosure to or the knowledge and consent of any of the Dolphin Companies. In fact, in e-mail correspondence to Rite Solutions, Gold expressly advised Rite Solutions against notifying O'Dowd of his efforts to improperly procure personal gain until such time as an agreement was in place. A copy of the correspondence is attached hereto as Exhibit "**F**." Moreover, Peikin and Gold sought to make any agreement reached between Rite Solutions and DDM contingent upon the execution of a commission agreement with Bespoke.

60.    When Rite Solutions refused to enter into side agreements with officers and counsel of the Dolphin Companies and threatened to disclose their solicitation to DDM, Gold

ABADIN COOK    DADELAND CENTRE,    SUITE 1208,    9155 SOUTH DADELAND BLVD.,    MIAMI, FL 33156
TELEPHONE: 305-670-4777 X2224 OR 2237    DIRECT FAX: 305-437-8144 OR 305-503-6794    EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

attempted to avoid the revelation of his scheme by distancing himself from Peikin and relying on his pre-existing relationship with Rite Solutions' principals as a basis to demonstrate his trustworthiness.  Copies of his e-mail correspondence to Rite Solutions are attached hereto as Composite Exhibit "**G**."

61.    Still trying to personally profit from the introduction of DDM to Rite Solutions, Gold prepared and forwarded a proposed written agreement detailing a commission structure payable to GSquared instead of Bespoke and forwarded it to Rite Solutions for execution on July 20, 2009.  A copy of the proposed agreement and correspondence to Rite Solutions transmitting same is attached hereto as Composite Exhibit "**H**."

62.    All of the foregoing communications were made without the knowledge or consent of any of the Dolphin Companies and continued until at least July 30, 2009.

### Peikin Withdrew Funds From DEC's Account.

63.    At or about the time that he and Gold were scheduled to meet with Rite Solutions, Peikin began withdrawing money from DEC's bank account to which he had access. Commencing on or about May 4, 2009, Peikin began withdrawing funds in $500.00 increments at irregular intervals.  By July 6, 2009, Peikin had withdrawn approximately $3,500 without explanation or justification.

64.    On July 9, 2009, Peikin withdrew $9,200.00 from DEC's account without explanation or justification.  On July 14, 2009, Peikin withdrew $6,698.91 without explanation or justification.  On July 20, 2009, he inexplicably made two (2) withdrawals in the amounts of $9,500.00 and $2,000.00, respectively.

ABADIN COOK    DADELAND CENTRE,   SUITE 1208,   9155 SOUTH DADELAND BLVD.,   MIAMI, FL 33156
TELEPHONE: 305-670-4777 x2224 OR 2237    DIRECT FAX: 305-437-8144 OR 305-503-6794   EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

65.    Peikin has neither accounted for nor returned any portion of the money he withdrew from DEC's account.

**The Stock Transfer Scheme.**

66.    In or about July 2008, Peikin suggested to DDM that it should create a pool of free-trading stock for future transactions with investor relations firms and others seeking compensation in stock.  Peikin suggested that some shares of DDM's treasury shares should be placed with a consulting company specializing in the holding, management and transfer of corporate shares pending such stock's ability to be freely-traded.

67.    O'Dowd took the recommendation under advisement, but never authorized the deposit of DDM's shares with any outside entity.

68.    That notwithstanding, on December 22, 2008, DDM allegedly issued a Unanimous Written Consent of the Sole Director in Lieu of a Special Meeting of the Board of Directors (the "**First Consent**").  A copy of the First Consent is attached hereto as Exhibit "**I**." Therein, DDM purportedly authorized the execution of a consulting agreement with Carta in exchange for the tender of 500,000 shares of DDM's common stock, which shares were restricted from trade for six (6) months.  To date, DDM is unaware of what consulting services were to be provided by Carta, what the alleged consulting agreement looks like and believes the signature on the First Consent to be a forgery.

69.    A second resolution (the "**Second Consent**") dated June 15, 2009 purportedly allowed for the issuance of another 500,000 shares of DDM stock to Carta in exchange for services to be furnished by Carta pursuant to a renewal of the consulting agreement.  A copy of the June 15, 2009 resolution is attached hereto as Exhibit "**J**."  These latter shares were also

_____ 14

restricted from trade for six (6) months (the "**Second Shares**"). DDM is unaware what consulting services were to be provided, what the renewal looks like and believes the Second Consent to be a forgery.

70.      On July 8, 2009, Gold prepared and sent a letter in his capacity as DDM's associate general counsel to NATCO directing:

   a. the issuance of 500,000 shares of DDM's common stock to Carta based upon the December 22, 2008 First Consent; and

   b. the issuance of another 500,000 shares of DDM's common stock to Carta based upon the Second Consent form dated June 15, 2009.

A copy of the letter is attached hereto as Exhibit "**K**." Gold transmitted the letter by U.S. Mail and wire.

71.      NATCO effected the requested issuance and transferred the DDM shares to Peikin's personal stockbroker at Merrill Lynch without further notice or disclosure to anyone at DDM. Merrill Lynch, however, rejected the Second Shares on the grounds that they were restricted from trade for approximately five (5) more months.

72.      On July 16, 2009, then, Gold, again in his capacity as associate general counsel for DDM, prepared another letter to NATCO simply advising that the shares to be issued pursuant to the Second Consent should be made effective as of January 1, 2009 and not the actual date of issuance so as to avoid the restrictive period applicable to the alienability of the shares. A copy of the letter is attached hereto as Exhibit "**L**." Gold transmitted the letter by U.S. Mail and wire.

15

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

73.     NATCO effected the requested transaction and issued DDM's 500,000 shares of common stock without restriction and transferred same to Merrill Lynch.

74.     On July 28, 2009, Peikin and Gold directed Merrill Lynch to transfer 500,000 of the DDM Shares held by Carta to "Cede & Co.," the standard fictitious designation assigned to shares turned over to a broker for sale.  On July 30, 2009, Peikin and Gold directed Merrill Lynch to transfer the remaining 500,000 DDM Shares held by Carta to "Cede & Co.," thereby making the entire 1,000,000 shares immediately eligible for sale.

75.     As a result of the foregoing, the Dolphin Companies have been required to retain the undersigned counsel and agreed to pay a reasonable fee for its services.

76.     All conditions precedent to the maintenance of this action have been complied with or waived.

## COUNT I
## RACKETEER INFLUENCED CORRUPT PRACTICES ACT VIOLATION
### (DDM vs. Peikin, Gold and Carta)

77.     Plaintiffs reallege paragraphs 1-5, 8-51 and 66-76 in support of this count.

78.     This count is brought by DDM against Peikin, Gold and Carta for violation of 18 U.S.C. 1962(c) ("**RICO**").

79.     Peikin, Gold and Carta constituted and conducted an enterprise, as they were and are a group of persons and entities associated together for the purpose of achieving the common goal of wrongfully obtaining the DDM Shares.

80.     Through the enterprise, Peikin, Gold and Carta engaged in a pattern of racketeering.

ABADIN COOK    DADELAND CENTRE,   SUITE 1208,   9155 SOUTH DADELAND BLVD.,   MIAMI, FL 33156
TELEPHONE: 305-670-4777 x2224 OR 2237    DIRECT FAX: 305-437-8144 OR 305-503-6794   EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

81.     Among the predicate acts undertaken by the enterprise in furtherance of its scheme was the transmission of Gold's July 8, 2009 and July 16, 2009 letters to NATCO.

82.     The transmission of the letters each constituted a separate instance of mail and/or wire fraud in furtherance of the scheme's common goal, as follows:

a.     Peikin, Gold and Carta failed to disclose to DDM the fact that they were authorizing and issuing the DDM Shares to themselves secretly, without consideration and without the consent or knowledge of DDM, which omission was material;

b.     the omission constituted a false representation of material fact;

c.     the omission was intended and reasonably calculated to induce DDM's reliance thereon and would otherwise deceive persons of ordinary prudence and comprehension;

d.     DDM did, in fact, rely on the material omission to its detriment; and

e.     DDM's reliance proximately caused the damages to its business occasioned by the DDM's Shares' issuance and transfer.

83.     In the execution of their scheme and to effectuate its goals, Peikin, Gold and Carta used the interstate mails and wires in violation of 18 U.S.C. §§1341 and 1343. Alternatively, Peikin, Gold and Carta executed their scheme with knowledge that the use of the mails and wires would follow in the ordinary course of business and could otherwise reasonable be foreseen in violation of 18 U.S.C. §§1341, 1343.

**WHEREFORE**, DDM demands the entry of final judgment in its favor and against Peikin, Gold and Carta for treble damages, directing that Peikin, Gold and Carta disgorge any

17

proceeds realized from their scheme, divest themselves of the DDM Shares by delivering same to DDM, for costs and attorneys' fees as authorized pursuant to 18 U.S.C. §1964(c) and for such additional relief as is authorized by 18 U.S.C. §1964 and the Court deems just and appropriate.

## COUNT II

### RICO CONSPIRACY (DDM vs. Peikin, Gold & Carta)

84.    DDM realleges paragraphs 1-5, 8-51 and 66-77 in support of this count.

85.    This count is for RICO conspiracy (18 U.S.C. §1962(d)) by DDM against Peikin, Gold and Carta.

86.    Peikin, Gold and Carta formulated and established an agreement to participate in the conduct of an enterprise through a pattern of racketeering activity through the commission of two (2) or more predicate acts in violation of 18 U.S.C. 1962(c).  Specifically, they agreed to use the mails and wires to wrongfully obtain the issuance and transmission of the DDM Shares to themselves in violation of 18 U.S.C. §§1341 and 1343.

**WHEREFORE**, DDM demands the entry of final judgment in its favor and against Peikin, Gold and Carta for treble damages, directing that Peikin, Gold and Carta disgorge any proceeds realized from their scheme, divest themselves of the DDM Shares by delivering same to DDM, for costs and attorneys' fees as authorized pursuant to 18 U.S.C. §1964(c) and for such additional relief as is authorized by 18 U.S.C. §1964 and the Court deems just and appropriate.

## COUNT III

### CIVIL CONSPIRACY (DDM vs. Peikin, Gold & Carta)

87.    Plaintiffs reallege paragraphs 1-5, 8-51 and 66-76 in support of this count.

ABADIN COOK    DADELAND CENTRE,   SUITE 1208,   9155 SOUTH DADELAND BLVD.,   MIAMI, FL 33156
TELEPHONE: 305-670-4777 x2224 OR 2237    DIRECT FAX: 305-437-8144 OR 305-503-6794   EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

88.     This count is brought by DDM against Peikin, Gold and Carta for civil conspiracy to defraud DDM by use of the mail and wires (18 U.S.C. §§1341, 1343).

89.     Peikin, Gold and Carta formulated, devised and participated in a scheme to defraud DDM of the DDM shares by:

      a.     failing to disclose to DDM the fact that they were authorizing and issuing the DDM Shares to themselves secretly, without consideration and without the consent or knowledge of DDM, which omission was material;

      b.     the omission constituted a false representation of material fact;

      c.     the omission was intended and reasonably calculated to induce DDM's reliance thereon and would otherwise deceive persons of ordinary prudence and comprehension;

      d.     DDM did, in fact, rely on the material omission to its detriment; and

      e.     DDM's reliance proximately caused the damages occasioned by the DDM's Shares' issuance and transfer.

90.     In the execution of their scheme and to effectuate its goals, Peikin, Gold and Carta used the interstate mails and wires in violation of 18 U.S.C. §§1341 and 1343.  Alternatively, Peikin, Gold and Carta executed their scheme with knowledge that the use of the mails and wires would follow in the ordinary course of business and could otherwise reasonably be foreseen in violation of 18 U.S.C. §§1341, 1343.

**WHEREFORE**, DDM demands the entry of final judgment in its favor and against Peikin, Gold and Carta for damages, costs and for such additional relief as this Court deems just and appropriate.

_____ 19

*Dolphin Digital Media, Inc., et. al. v. Peikin, et. al.*
Complaint, Case No. _____

## COUNT IV

### IMPOSITION OF A CONSTRUCTIVE TRUST (DDM v. Peikin, Gold & Carta)

91.　　DDM realleges paragraphs 1- 5, 8-51 and 66-76 in support of this count.

92.　　This count seeks the imposition of a constructive trust over the Restricted Shares and is brought by DDM against Peikin, Gold, and Carta.

93.　　Peikin and Gold served as fiduciaries to DDM.

94.　　As fiduciaries, Peikin and Gold owed DDM the implied promise to act in good faith in the best interest of the corporation, and to refrain from reaping personal benefits to the corporation's detriment.

95.　　In their capacity as fiduciaries and by exploiting their relationship with DDM, Peikin and Gold were able to procure the unauthorized and secret issuance of DDM Shares without paying consideration therefor and transfer same to Carta.

96.　　By causing such transfer, DDM was damaged.

**WHEREFORE**, DDM demands the entry of a final judgment in its favor and against Peikin, Gold and Carta imposing a constructive trust in favor of DDM over the DDM Shares and all proceeds obtained or derived therefrom, for costs and for such additional relief as this Court deems just and appropriate.

## COUNT V

### ATTACHMENT (DDM v. Peikin, Gold &  Carta)

97.　　DDM realleges paragraphs 1-5, 8-51 and 66-76 in support of this count.

98.　　This count is for attachment of the DDM Shares and is brought by DDM against Peikin, Gold and Carta.

---

20

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

99.     DDM Shares and attendant stock certificates are present.

100.    Peikin, Gold and Carta obtained the DDM Shares without paying any consideration therefor and otherwise without authorization.  Accordingly, Peikin, Gold, Carta are indebted to DDM.

101.    Peikin, Gold and Carta will fraudulently part with the DDM Shares before a final judgment can be obtained against them.  Similarly, they are, at present, fraudulently disposing of the DDM Shares.

102.    Peikin, Gold and Carta have placed the Shares beyond the jurisdiction of the Court.

103.    Peikin and Gold have or are about to remove themselves from the State of Florida and the jurisdiction of the Court.

104.    The DDM Shares do not obtain of a known value, as they are traded on the open market.  On October 1, 2009, the properly authorized and publicly-available shares of DDM for sale were valued at $.44 per share.

**WHEREFORE**, DDM demands the entry of final judgment in its favor and against Peikin, Gold and Carta directing the issuance of a Writ of Attachment commanding the U.S. Marshal to seize the DDM Shares and all proceeds obtained or derived therefrom, as well as the related stock certificates and deliver same to the possession of DDM, for costs and for such additional relief as this Court deems just and appropriate.

## COUNT VI

### REPLEVIN (DDM vs. Peikin, Gold and Carta)

105.    DDM realleges paragraphs 1-5, 8-51 and 66-76 in support of this count.

**ABADIN COOK**     DADELAND CENTRE,   SUITE 1208,   9155 SOUTH DADELAND BLVD.,   MIAMI, FL 33156
TELEPHONE: 305-670-4777 x2224 OR 2237     DIRECT FAX: 305-437-8144 OR 305-503-6794   EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

106.   This count is for replevin of the DDM Shares and is brought by DDM against Peikin, Gold and Carta.

107.   Because Dam's personal property has been wrongfully detained by Peikin, Gold and Carta, the issuance of a prejudgment writ of replevin to recover the DDM Shares is necessary.

108.   The property to be replevied consists of 1,000,000 shares of DDM stock represented by Certificate Nos. 2094, 2096 and 2101 of the Dolphin Digital Media, Inc. stock ledger.

109.   The DDM Shares do not obtain of a known value, as they are traded on the open market.  On October 1, 2009, the properly authorized and publicly-available shares of DDM for sale were valued at $.44 per share.

110.   The DDM Shares and attendant stock certificates are presently in the possession of Merrill Lynch.

111.   DDM is the proper owner of the DDM Shares and attendant stock certificates, is entitled to immediate possession thereof as the DDM Shares represent an ownership interest in the corporation that was issued and transferred away without the knowledge or approval of DDM and was taken without the giving of consideration therefor.

112.   The DDM Shares were wrongfully procured and are wrongfully detained by Peikin, Gold, Carta and Merrill Lynch.

113.   The means by which Peikin, Gold, Carta and Merrill Lynch came into possession of the DDM Shares and attendant stock certificates are detailed above.

ABADIN COOK    DADELAND CENTRE,   SUITE 1208,   9155 SOUTH DADELAND BLVD.,   MIAMI, FL 33156
TELEPHONE: 305-670-4777 x2224 OR 2237    DIRECT FAX: 305-437-8144 OR 305-503-6794   EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

114.    Peikin, Gold and Carta detain the DDM Shares for the purposes of illegally and improperly profiting at the expense of DDM and its other shareholders as part of a larger scheme to divert Plaintiffs' assets and opportunities to themselves.

115.    Neither the DDM Shares nor the attendant stock certificates have been taken for a tax, assessment, or fine pursuant to law.  Similarly, they have not been taken under an execution or attachment against the property of DDM.

116.    Because of the surreptitious means by which the DDM Shares were issued and transferred without authorization from or consideration paid to DDM and thereafter placed with Peikin's personal stockbroker at Merrill Lynch for sale, DDM is of the appropriately reasonable belief that the DDM shares will be concealed, wasted or transferred to innocent purchasers during the pendency of this action.  Peikin, Gold and Carta already placed the DDM Shares beyond the jurisdiction of the Court.

**WHEREFORE**, DDM demands the entry of final judgment in its favor and against Peikin, Gold and Carta directing the issuance of a Writ of Replevin commanding the U.S. Marshal Service to seize the DDM Shares and all proceeds obtained or derived therefrom, as well as the related stock certificates and deliver same to the possession of DDM, for costs and for such additional relief as this Court deems just and appropriate.

### COUNT VII

### ACCOUNTING (DDM vs. Peikin, Gold, Carta and Merrill Lynch)

117.    DDM realleges paragraphs 1-5, 8-51 and 66-76 in support of this count.

118.    This count seeks an equitable accounting to DDM by Peikin, Gold, Carta and Merrill Lynch.

---

23

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

119.   Peikin and Gold were at all times material and remain DDM fiduciaries.

120.   The issuance and transfer of the DDM Shares from DDM to Carta to Merrill Lynch is a complex transaction.

121.   There is no adequate remedy at law to determine the extent of the foregoing transfer or its ultimate consequences.

**WHEREFORE**, DDM demands the entry of final judgment in its favor and against Peikin, Gold, Carta and Merrill Lynch: 1) determining that DDM is entitled to an accounting from Peikin, Gold, Carta and Merrill Lynch of the DDM Shares and all proceeds obtained or derived therefrom; 2) for the accounting; and 3) for such additional relief as this Court deems just and appropriate.

## COUNT VIII

### PERMANENNT INJUNCTION
### (DDM vs. Peikin, Gold, Carta, Merrill Lynch & NATCO)

122.   DDM realleges paragraphs 1-5, 8-51 and 66-76 in support of this count.

123.   This count is for permanent injunction and brought by DDM against Peikin, Gold, Carta, Merrill Lynch and NATCO.

124.   Failure to impose a temporary injunction to prevent the transfer of the stock will result in irreparable injury to DDM

125.   There is no adequate remedy at law to prevent Peikin, Gold and Carta from furthering the scheme they previously set in motion and to prevent the transfer of DDM's shares.

126.   DDM obtains of a substantial likelihood of success on the merits of its claims set forth in the Verified Complaint.

_____ 24

127.   The harm to be visited upon DDM in the event the injunction does not issue would be far greater than the potential harm to Peikin, Gold, Carta, NATCO and Merrill Lynch if it does.

128.   The issuance of an injunction like the one sought in this motion will not disserve public policy.

**WHEREFORE**, DDM demands the entry of final judgment in its favor and against Peikin, Gold, Carta, Merrill Lynch and NATCO preventing Peikin, Gold, Carta, NATCO and Merrill Lynch, as well as their respective officers, agents, servants, attorneys and those in active concert and participation with them, from transferring, conveying, selling, pledging or encumbering any DDM stock certificates and the shares represented thereby currently held by any of them, requiring that they deliver same into the possession of DDM, for costs and for such additional relief as this Court deems just and appropriate.

## COUNT IX

### FRAUD (DEI v. Peikin)

129.   DEI realleges paragraphs 1-4, 11, 12 and 16-76 in support of this count.

130.   This count is brought by DEI against Peikin for fraud.

131.   In seeking employment with DEI, Peikin represented to O'Dowd that, through his connections and experience, he possessed the ability to generate greater revenue for DEI by leaving the practice of law, joining DEI and forming DEC.

132.   Peikin did not intend to work with DEI or DEC, but to use the business of the Dolphin Companies to further his own personal ambitions in the media finance industry. Accordingly, the representation was material and false when made.

**ABADIN COOK**   DADELAND CENTRE,   SUITE 1208,   9155 SOUTH DADELAND BLVD.,   MIAMI, FL 33156
TELEPHONE: 305-670-4777 X2224 OR 2237   DIRECT FAX: 305-437-8144 OR 305-503-6794   EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

133.    Peikin made the material misrepresentation of fact with the intent that DEI rely thereon.

134.    DEI justifiably relied on Peikin's representation to its detriment.

135.    As a proximate result thereof, DEI was damaged.

**WHEREFORE**, DEI demands the entry of final judgment for damages in its favor and against Peikin, plus costs and for such additional relief as this Court deems just and appropriate.

### COUNT X

### BREACH OF FIDUCIARY DUTY (DDM v. Gold)

136.    DDM realleges paragraphs 1-5, 11-51 and 76 in support of this count.

137.    This count is brought by DDM against Gold for breach of fiduciary duty.

138.    As an officer of DDM, Gold maintained a fiduciary relationship with the corporation.

139.    Gold breached such duty by continuing with his employment with Brown Rudnick while in the employ of DDM.

140.    Such breach damaged DDM.

**WHEREFORE**, DDM demands the entry of final judgment for damages in its favor and against Gold, plus costs and for such additional relief as this Court deems just and appropriate.

### COUNT XI

### BREACH OF FIDUCIARY DUTY (DEI & DEC v. Peikin)

141.    DEI and DEC reallege paragraphs 1-4, 6, 11-55 and 76 in support of this count.

142.    This count is brought by DEI and DEC against Peikin for breach of fiduciary duty.

26

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

143.    As officers of both DEI and DEC, Peikin maintained a fiduciary relationship with each.

144.    By establishing and operating Bespoke, Peikin breached his obligations as a fiduciary.

145.    Such breach damaged DEI and DEC.

**WHEREFORE**, DEI and DEC demand the entry of final judgment for damages in their favor and against Peikin, plus costs and for such additional relief as this Court deems just and appropriate.

### COUNT XII

### BREACH OF FIDUCIARY DUTY (DDM v. Gold)

146.    DDM realleges paragraphs 1, 4-6, 11-55 and 75-76 in support of this count.

147.    This count is brought by DDM against Gold for breach of fiduciary duty.

148.    As an officer of DDM, Gold maintained a fiduciary relationship with the corporation.

149.    By establishing and operating Bespoke, Gold breached his duties as a fiduciary.

150.    Such breach damaged DDM.

**WHEREFORE**, DDM demands the entry of final judgment for damages in its favor and against Gold, for costs and for such additional relief as this Court deems just and appropriate.

ABADIN COOK     DADELAND CENTRE,   SUITE 1208,   9155 SOUTH DADELAND BLVD.,   MIAMI, FL 33156
TELEPHONE: 305-670-4777 X2224 OR 2237     DIRECT FAX: 305-437-8144 OR 305-503-6794   EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

## COUNT XIII

### UNJUST ENRICHMENT (DDM, DEI & DEC v. Peikin, Gold, Bespoke and Gsquared)

151.    DDM, DEI and DEC reallege paragraphs 1- 6, 11-55 and 75-76 in support of this count.

152.    This count is brought by DDM, DEI and DEC against Peikin, Gold, Bespoke, and Gsquared for unjust enrichment.

153.    DDM, DEI and DEC conferred a benefit on Peikin, Gold, Bespoke, and Gsquared by granting them access to their industry knowledge, contacts, experience, business methodologies and reputation.   Such access resulted in the creation and consummation of business opportunities for Peikin, Gold, Bespoke, and Gsquared.

154.    Peikin, Gold, Bespoke, and Gsquared had knowledge of the benefit conferred.

155.    Peikin, Gold, Bespoke, and Gsquared voluntarily accepted and retained the benefit conferred.

156.    The circumstances are such that it would be inequitable to allow Peikin, Gold, Bespoke, and Gsquared to retain the value of the benefit conferred without paying the value thereof to DDM, DEI and DEC.

**WHEREFORE**, DDM, DEI and DEC demand the entry of final judgment in their favor and against Peikin, Gold, Bespoke, and Gsquared in an amount equal to the value of the benefit conferred, for costs and for such additional relief as this Court deems just and appropriate.

ABADIN COOK   DADELAND CENTRE,  SUITE 1208,  9155 SOUTH DADELAND BLVD.,  MIAMI, FL 33156
TELEPHONE: 305-670-4777 X2224 OR 2237   DIRECT FAX: 305-437-8144 OR 305-503-6794  EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

## COUNT XIV

### CONVERSION (DDM, DEI & DEC v. Peikin, Gold, Bespoke and Gsquared)

157.    DDM, DEI and DEC reallege paragraphs 1-6, 11-55 and 75-76 in support of this count.

158.    This count is brought by DEI and DEC for conversion against Peikin, Gold, Bespoke, and Gsquared.

159.    In the course of their employment with the Dolphin Companies, Peikin and Gold wrongfully asserted dominion over and otherwise converted to their own use and for the benefit of Bespoke, and Gsquared various corporate opportunities that were the property of the Dolphin Plaintiffs.

160.    By virtue of such conversion, the Dolphin Plaintiffs were damaged.

**WHEREFORE**, DDM, DEI and DEC demand the entry of final judgment for damages in their favor and against Peikin, Gold, Bespoke, and Gsquared for costs and for such additional relief as this Court deems just and appropriate.

## COUNT XV

### BREACH OF FIDUCIARY DUTY (DEC v. Peikin)

161.    DEC realleges paragraphs 3, 4, 11, 12, 15, 16, 18-65 and 75-76 in support of this count.

162.    This count is brought by DEC against Peikin for breach of fiduciary duty.

163.    As an officer and director, Peikin maintained a fiduciary relationship with DEC.

164.    Peikin breached his fiduciary duties to DEC by removing money from its bank accounts for his personal use and for the benefit of Bespoke.

**ABADIN COOK**   DADELAND CENTRE,  SUITE 1208,  9155 SOUTH DADELAND BLVD.,  MIAMI, FL 33156
TELEPHONE: 305-670-4777 X2224 OR 2237   DIRECT FAX: 305-437-8144 OR 305-503-6794  EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

165.    Such breaches damaged DEC.

**WHEREFORE**, DEC demands the entry of final judgment for damages in its favor and against Peikin, plus costs and for such additional relief as this Court deems just and appropriate.

## COUNT XVI

### UNJUST ENRICHMENT (DEC v. Peikin)

166.    DEC realleges paragraphs 3, 4, 11, 12, 15, 16, 18-65 and 75-76 in support of this count.

167.    This count is brought by DEC against Peikin for unjust enrichment.

168.    By obtaining DEC's money for his personal use and for the benefit of Bespoke, DEC conferred a benefit on Peikin.

169.    Peikin had knowledge of the benefit conferred.

170.    Peikin voluntarily accepted and retained the benefit conferred.

171.    The circumstances are such that it would be inequitable to allow Peikin to retain the value of the benefit conferred without paying the value thereof to DEC.

**WHEREFORE**, DEC demands the entry of final judgment in its favor and against Peikin in an amount equal to the value of the benefit conferred upon him, plus costs and for such additional relief as this Court deems just and appropriate.

## COUNT XVII

### BREACH OF FIDUCIARY DUTY (DDM, DEI and DEC v. Peikin & Gold)

172.    DDM, DEI and DEC reallege paragraphs 1-7, 11-62 and 75-76 in support of this count.

173.    This count is brought by DDM, DEI and DEC against Peikin and Gold for breach of fiduciary duty.

174.    As officers and directors of the Dolphin Companies, Peikin and Gold maintained fiduciary relationships with the corporations.

175.    Peikin and Gold breached their fiduciary duties by surreptitiously contacting and negotiating with Rite Solutions to attempt to usurp and divert corporate opportunities away from their employers and to and for the benefit of Bespoke and GSquared.

176.    Such breach damaged DDM, DEI and DEC.

**WHEREFORE**, DDM, DEI and DEC demand the entry of final judgment for damages in their favor and against Peikin and Gold, plus costs and for such additional relief as this Court deems just and appropriate.

## COUNT XVIII

### UNJUST ENRICHMENT (DDM v. Peikin, Gold & Carta)

177.    DDM realleges paragraphs 1-7, 11-62 and 75-76 in support of this count.

178.    This count is brought by DDM against Peikin, Gold and Carta for unjust enrichment.

179.    By transferring to themselves and obtaining possession and ownership of DDM's shares, DDM conferred a benefit on Peikin.

180.    Peikin, Gold and Carta had knowledge of the benefit conferred.

181.    Peikin, Gold and Carta voluntarily accepted and retained the benefit conferred.

182.    The circumstances are such that it would be inequitable to allow Peikin, Gold and Carta to retain the value of the benefit conferred without paying the value thereof to DDM.

31

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No. _____

**WHEREFORE**, DDM demands the entry of final judgment in its favor and against Peikin, Gold and Carta in an amount equal to the value of the benefit conferred upon them, plus costs and for such additional relief as this Court deems just and appropriate.

## COUNT XIX

### CONVERSION (DDM v. Peikin, Gold & Carta)

183.    DDM realleges paragraphs 1- 5, 8-51 and 66-76 in support of this count.

184.    This count is brought by DDM against Peikin, Gold and Carta for conversion.

185.    In July 2009, Peikin, Gold and Carta wrongfully asserted dominion over and otherwise converted to their own use DDM's stock that was the property of DDM.

186.    By virtue of such conversion, DDM was damaged.

**WHEREFORE**, DDM demands the entry of final judgment for damages in its favor and against Peikin, Gold and Carta, plus costs and for such additional relief as this Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all the issues raised by the pleadings in this cause as may be properly tried to a jury.

ABADIN COOK    DADELAND CENTRE,   SUITE 1208,   9155 SOUTH DADELAND BLVD.,   MIAMI, FL 33156
TELEPHONE: 305-670-4777 X2224 OR 2237    DIRECT FAX: 305-437-8144 OR 305-503-6794   EMAIL: RABADIN@ABADINCOOK.COM OR
KJACOBS@ABADINCOOK.COM

Dolphin Digital Media, Inc., *et. al.* v. Peikin, *et. al.*
Complaint, Case No._____

Dated: October ___1___, 2009.

## **VERIFICATION**

I hereby declare, under penalty of perjury, that the foregoing allegations are true

and correct to the best of my information and belief.


_____
**William O'Dowd IV, Esq.**


Respectfully submitted,

**ABADIN COOK**
Counsel for Plaintiffs
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156
(305) 670-4777 Telephone
(305) 503-6794 or (305) 437-8144 EFAX


**Ramón A. Abadin, Esq.**
Fla. Bar No. 707988
*Email: rabadin@abadincook.com*
**Kai E. Jacobs, Esq.**
Fla. Bar No. 987336
*Email: kjacobs@abadincook.com*

EXHIBIT A

May 28, 2008

**Via E-Mail (billodowd@dolphinentertainment.net)**
Dolphin Entertainment, Inc.
804 Douglas Road, Suite 365
Coral Gables, FL 33134 USA
Attn: Mr. Bill O'Dowd, CEO

Re: *Request for Conflict Waiver*

Dear Bill:

The purpose of this letter is to request a conflict of interest waiver from Dolphin Entertainment, Inc., its subsidiaries and affiliates (collectively, "Dolphin") in connection with our representation of Logica Holdings, Inc. ("Logica") in the negotiation of a proposed commercial agreement between Dolphin and Logica under which (i) Logica would license its child-safe on-line social networking platform technology to Dolphin; and (ii) Dolphin would assume the promotion and operation of Logica's existing and future on-line social networks (the "Contract Negotiations").

We hereby request that Dolphin waive any claim that our service as counsel to Logica in the Contract Negotiations represents a conflict of interest, and that Dolphin consent to our service as counsel to Logica in the Contract Negotiations on the conditions set forth in this letter.

We confirm that Dolphin's consent, if given, would not be deemed to be a consent to our representation of Logica as a party in any litigation against Dolphin and that we would not act as counsel to Logica in any such litigation. Dolphin confirms that our representation of Logica will not serve as a basis to disqualify or otherwise restrict us from representing Dolphin or Logica in connection with any current or future unrelated matters.

1

*Conflict Waiver Dolphin Entertainment, Inc. Re: Logica Holdings, Inc. Contract Negotiations, May 28, 2008—Signature Page*

Your consent may be given by signing this letter where noted and returning it to me. Thank you very much for your consideration of this request. Of course, please call with any questions.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _Mark H. Peikin_
     Mark H. Peikin

Consent, as requested, is hereby given
this 28th day of May, 2008.

**DOLPHIN ENTERTAINMENT, INC., its subsidiaries and affiliates**

_Bill O'Dowd_

Bill O'Dowd
CEO

# 1566339 v1 - GOLDJM - 027601/0001

2

EXHIBIT B



**Contact:**
Pino G. Baldassarre
President and Managing Director
Dolphin Digital Media, Inc.
416-929-5798
-or-
Ron Stabiner
The Wall Street Group, Inc.
212-888-4848

**Brown Rudnick Contact:**
Lisa Murray
617-856-8509
lmurray@brownrudnick.com

**FOR IMMEDIATE RELEASE:**

## DOLPHIN DIGITAL MEDIA RETAINS INTERNATIONAL LAW FIRM OF BROWN RUDNICK LLP AS GENERAL COUNSEL

**TORONTO – December 2, 2008 – Dolphin Digital Media, Inc. (OTCBB: DPDM.OB),** a developer of unique social networking websites using state-of-the-art fingerprint identification technology, announced today that it has retained the services of the law firm Brown Rudnick LLP to represent the Company as general counsel. Mark H. Peikin, Chair of Brown Rudnick's Entertainment & Digital Media Group, and a partner in the Firm's Corporate & Securities Group, will act as lead attorney.

"We are delighted to retain the services of Brown Rudnick as our general counsel, especially given their instrumental work in connection with the recent completion of a $100 million film financing with Continental Entertainment Capital, an affiliate of Citi, Inc. for Dolphin Entertainment, our licensing partner," said Bill O'Dowd, Chairman and Chief Executive Officer, Dolphin Digital Media, Inc. "The Firm's broad range of capabilities and experience across corporate, securities, entertainment, digital media, Web 2.0, finance, and intellectual property law are a valuable asset to my strategic business mission."

Brown Rudnick's Entertainment & Digital Media Group offers substantial experience in representing companies with regard to financings, public offerings, mergers and acquisitions, structuring and financing of equity film and television production funds, establishment of prints and advertising revolving debt facilities, and the securitization of film and music libraries.

"We are excited to be representing the interests of Dolphin Digital Media," said attorney Mark Peikin. "We believe the Company has an extremely promising future, and look forward to continuing our successful relationship with the Dolphin family of brands."

### ABOUT DOLPHIN DIGITAL MEDIA, INC. (www.dolphindigitalmedia.com)

Dolphin Digital Media, Inc., formerly Logica Holdings, creates and manages social networking websites for children utilizing state-of the-art fingerprint identification technology around Dolphin's core brands of popular television programs for children, including Nickelodeon's top-rated series *Zoey 101, Ned's Declassified School Survival Guide,* and the mystery movie franchise *Roxy Hunter,* among many others. As a leading developer of Internet safety technology operating in the entertainment, digital media, e-commerce and information technology sectors, there is a focus on the growing global market for social networking, downloadable entertainment content and branded merchandise sales.

(more)

2

At the heart of Dolphin Digital Media's high-tech security platform are the solutions of its technology partners: Novell Corporation, Rackspace, Fujitsu, and 123ID, all integrated through an exclusive worldwide license with Weblock International. Working with its technology partners, DDM is able to offer a proprietary platform of identity management and database solutions.

## ABOUT BROWN RUDNICK LLP

Brown Rudnick is an international law firm with offices in the United States and Europe. The Firm represents clients from around the world, providing business-focused solutions that address today's ever-changing, ever-demanding competitive marketplace. With an entrepreneurial and collaborative mindset, Brown Rudnick offers a broad slate of capabilities and talents in areas that include: Corporate and Securities, Entertainment & Digital Media, Intellectual Property, Finance, Energy, Bankruptcy & Corporate Restructuring, Complex Litigation, Government Contracts, Government Law & Strategies, Health Law and Real Estate. For more information, please visit www.brownrudnick.com.

The Brown Rudnick Center for the Public Interest is a measure of the Firm's strong commitment to the community and serves as an umbrella entity encompassing the Firm's pro bono legal work, charitable giving, community involvement and public interest efforts. For more information, please visit www.brownrudnickcenter.com.

## SAFE HARBOR STATEMENT

This press release may include forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, including statements related to anticipated revenues, expenses, earnings, operating cash flows, the outlook for markets and the demand for products. Forward-looking statements are not guarantees of future performance and are inherently subject to uncertainties and other factors which could cause actual results to differ materially from the forward-looking statements. Such statements are based upon, among other things, assumptions made by, and information currently available to, management, including management's own knowledge and assessment of the Company's industry and competition. The Company refers interested persons to its most recent Annual Report on Form 10-KSB and its other SEC filings for a description of additional uncertainties and factors, which may affect forward-looking statements. The Company assumes no duty to update its forward-looking statements.

###

EXHIBIT C



804 Douglas Road, Suite 365      Coral Gables, Florida 33134
305.744.0407
www.dolphinentertainment.com

January 13, 2009

Mr. Mark H. Peikin
2401 NW 114th Avenue
Coral Springs, Florida 33065

*Offer of Employment*
**General Counsel of Dolphin Entertainment; President of Dolphin Entertainment Capital;
Co-Manager of Dolphin Entertainment Capital Film Distribution Fund**

Dear Mark:

Greetings.  As you know, Dolphin Entertainment, Inc. ("Dolphin" or the "Company") enjoys its relationship with you as our outside general counsel.

Through our mutual success, which has been significant, we have come to appreciate the fact that your benefits to our organization extend well beyond your role as our trusted legal advisor. Today, Dolphin relies on your industry expertise as it relates to the identification, structuring and closing of film finance transactions.  We also recognize that your personal relationships with financial institutions, private equity and hedge funds, as well as high net-worth individuals that make investments in our industry-space, are vast.  In particular, we are impressed by your unique ability to match the right funding sources with a wide variety of projects destined for theatrical distribution or television programming.

Further to our recent discussions regarding my desire to more fully take advantage of your skill set, it is with great pleasure that Dolphin hereby extends to you this formal Offer of Employment with our Company.  We are offering you the position of in-house General Counsel for Dolphin as well as President of Dolphin Entertainment Capital, Inc. ("Dolphin Capital"), a to-be-formed affiliate of Dolphin.  Dolphin Capital will serve as arranger and financial manager of the financings that you will help us close for Dolphin and/or the third parties that we work with.  We also expect that in or before 2010, Dolphin Capital will form a film distribution fund to be known as the Dolphin Entertainment Capital Film Distribution Fund (the "Fund") with seed capital of approximately $10-15 million.  We would like you to help us arrange for this Fund and ask that you act as its President.



**MARK H. PEIKIN – OFFER OF EMPLOYMENT**                                    **JANUARY 13, 2009**

Your 2009 salary as General Counsel of Dolphin Entertainment will be $350,000 ("Base Salary"). In addition, we will guarantee a 2009 bonus to you of not less than $100,000 ("Guaranteed Bonus"). Salary will be payable monthly beginning on the three-month anniversary of the execution of this Offer Letter (the "Anniversary Date"). Also on the Anniversary Date, Dolphin will pay you in one lump sum your Base Salary for the first three months of your employment.

An executive-level benefits package will be made available to you, which will include full health insurance benefits for you on a Blue Cross Blue Shield PPO plan and subsidized rates for your family members. Your participation in the plan will be at the same level and on the same terms as our most senior employees currently.

We will also cover all of your approved business expenses. Recognizing that your position will be marketing intensive, your 2009 business expense budget ("Expense Budget") will be equal to ten percent (10%) of your Base Salary, or $35,000. The Expense Budget is subject to increase at our discretion based upon performance of Dolphin and Dolphin Capital.

Dolphin Entertainment Capital will be structured as a new company with two executive officers: Mark H. Peikin, President; and William O'Dowd, IV, Chairman and CEO. The share capital in the company will be divided equally between us.

All retainers, interim and/or success fees (collectively, "Success Fee(s)") paid in cash (or cash equivalents) to and any equity received by Dolphin Capital will be considered your Success Fees and/or "Earnings" as discussed and more fully explained herein. It is anticipated that your Earnings from Dolphin Capital will approach not less than three times (3x) your base salary ($1,050,000) during your first full calendar year with Dolphin and Dolphin Capital. However, your Earnings from Dolphin Capital will not be due or payable to you until your Earnings exceed your Dolphin Base Salary by one dollar ($1) (i.e., $350,001). All of your Dolphin Capital Earnings up to the amount of your Base Salary will be remitted as received by Dolphin Capital to Dolphin Entertainment ("Success Fee Threshold"). You will begin to earn your Base Salary from commencement of your employment with Dolphin.

After your Dolphin Capital Success Fees and/or Earnings exceed your Base Salary by $1 (i.e., the Success Fee Threshold has been met), the balance of your Earnings will be distributed and/or invested as received by Dolphin Capital as follows depending upon the type of transaction closed:

### *Financing / Investment(s) relating to Dolphin Entertainment or an Affiliated Entity*

- You will receive an average 5% Success Fee from Dolphin Entertainment, which such Success Fee shall be calculated based on the dollar value of any financing or investment ("Transaction Value") relative to properties and/or projects and/or working capital of Dolphin. Properties that will immediately qualify for a 5% Success Fee include the "Spectacular!" DVD Funds domestically and internationally as well as the anticipated equity raise relative to "Soul Surfer," and subsequent movies in the film fund. With regard to "Spectacular!" you will also receive a 5% equity stake per $5 million raised by your efforts as President of Dolphin Capital.

2



**MARK H. PEIKIN – OFFER OF EMPLOYMENT**                              **JANUARY 13, 2009**

- Dolphin Capital may also enter into contracts with and pay additional success fees to outside (third-party) consultants ("Consultants") pursuant to our mutual understanding, which shall not impact your compensation hereunder.
- Payments to Consultants shall not at all decrease your right or entitlement to the 5% Success Fee.
- No portion of the Success Fee for any financing or investment relative to Dolphin or any affiliated entities shall be payable to Dolphin or any affiliated entities or to me.

### *Financing / Investment(s) relating to deals presented to Dolphin Capital by Messrs. Peikin, O'Dowd or third parties not associated with Dolphin or any Affiliated Entity*

- 5% of total Earnings will remain in Dolphin Capital's operating account.
- 5% of total Earnings will be paid to Dolphin Entertainment pursuant to contract.
- Dolphin Capital will distribute 45% of total Earnings to you upon receipt of the same.
- Dolphin Capital will distribute 45% of total Earnings to me upon receipt of the same.
- Dolphin Capital may retain Consultants, which will impact distributions to us equally based on our mutual understanding as to any such arrangements.

### *Formation of Dolphin Entertainment Capital Film Distribution Fund*

- In or before 2010, Dolphin Capital will form the Fund with seed capital of approximately $10-15 million.
- You will work with us to help us arrange for the Fund and will serve as its President, and I will serve as its Chairman and CEO.
- Your equity stake in the Fund will not be less than three-fourths (3/4) of my equity stake (or of any company or affiliate that may hold my equity stake).

All of us at Dolphin Entertainment are excited by the potential of you working with us as we strive toward achievement of our vision for the Company's bright future. We are hopeful that you will decide to join our Company and embark on this new and exciting path.

All my best,

*William O'Dowd*

William O'Dowd, IV
CEO and Founder of Dolphin Entertainment

Accepted on this ____ day of January, 2009

By: _____
       Mark H. Peikin

3

EXHIBIT D



KLUGER KAPLAN

Reply to:
MICHAEL T. LANDEN
mlanden@klugerkaplan.com

July 24, 2009

**VIA FACSIMILE AND U.S. MAIL**
Dolphin Digital Media, Inc.
Mr. William O'Dowd IV
804 Douglas Road
Executive Tower Building, Suite 365
Coral Gables, FL 33134

Re:    **Resignation from Employment with Dolphin Digital Media, Inc. –
Joshua M. Gold**

Dear Mr. O'Dowd:

We represent Joshua M. Gold.  Please be advised that Mr. Gold has been forced to, and hereby does, resign from his position as Chief Compliance Officer and/or Associate General Counsel of Dolphin Digital Media, Inc. ("DDM" or the "Company") effective as of July 31, 2009, for the reasons discussed below.

Since transferring to DDM from his position as a partner-track associate at the law firm of Brown Rudnick LLP in reliance upon your representations of increased salary and professional advancement, Mr. Gold has been able to observe from an internal perspective DDM's complete lack of operational infrastructure as well as what Mr. Gold deems to be potential improprieties in your conduct as CEO of a publicly held, reporting company. Mr. Gold was surprised at and is gravely concerned by what he has observed.  This is the primary reason underpinning Mr. Gold's decision to terminate his employment with DDM.

Mr. Gold has also advised us that in addition to your suitability as CEO of a public company and lack of focus on operational excellence, his concerns also specifically include, without limitation, that:

- DDM has no accountant keeping the books of the Company and payroll payments, which are made "by hand," have been consistently delivered late;

- Health insurance, which you represented to Mr. Gold would be 100% covered by DDM, is in fact being arranged through an affiliated privately held entity, Dolphin Entertainment, Inc., which does not employ Mr. Gold and Mr. Gold is now being asked, contrary to prior agreement, to contribute 50% of the cost of such insurance without the benefit of pre-tax payroll deductions;

- The Company's apparent policy of being a "late payer," vis-à-vis third parties, has resulted, and continues to result in, an abnormally large number of claims by many of the Company's vendors against the Company for non-payment;

July 24, 2009
Page 2

- You, as CEO, pay only sporadic and frenetic attention to the affairs of the Company resulting from time and attention dedicated to your many other business activities unrelated to the Company and other matters unknown to Mr. Gold and DDM's other employees; and

- The Company appears to be understaffed and undercapitalized with no executive management, shareholders are routinely meddling in the affairs of the Company with your knowledge and participation, and you appear to be desperately scrambling to raise additional capital to fund continued day-to-day operations, regardless of the cost or the legality of the fund raising transaction(s).

Mr. Gold has further advised us that as an inducement to encourage him to join DDM, you represented that DDM would issue him a signing bonus of 200,000 shares of the Company's common stock. To date, however, you have not provided such shares. Accordingly, please have DDM send a stock certificate representing this issuance to our office within ten (10) business days of receipt of this letter. The certificate should bear an effective date equivalent to the first date of Mr. Gold's employment with DDM.

Mr. Gold has also informed us that as part of his employment package with DDM, DDM subscribes and pays the cost of a family healthcare plan with BlueCross BlueShield of Florida, which also covers Mr. Gold's family members, Alessandra Gold, Kevin Gold and Angelina Gold. Be advised that Mr. Gold may elect to purchase COBRA coverage for his family; thus, we ask that you provide this office with the appropriate information for a COBRA election in a timely fashion so that Mr. Gold can consider the COBRA option in an informed manner and so that there is no interruption in his family's coverage, particularly since Mr. Gold has young children that require routine pediatric care.

Given the basis for Mr. Gold's decision to terminate his employment, Mr. Gold has requested that we inform you that all further correspondence from you or DDM be transmitted to this office and that no attempt to contact Mr. Gold be made directly or indirectly by you, the Company, or its agents. In addition, as is customary, we reserve all of Mr. Gold's rights at law and in equity including the right to initiate legal action against you or DDM to the extent he has suffered additional harms, which may be significant, and may include, but may not be limited to, lost business opportunities, a decline the in the price of the common stock he was to receive as a result of some of your business practices of concern to Mr. Gold, an interruption in his legal career, and attorneys fees and costs pursuant to applicable Florida law.

Very truly yours,

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.

By: _____
Michael T. Landen

{Kluger Kaplan Litigation\0110\0375/M0650717 v.1 7/24/2009 12:57 PM }M0650570

The Miami Center • 201 S. Biscayne Blvd. • Seventeenth Floor • Miami, FL 33131 • Ph: (305) 379-9000 • Fax: (305) 379-3428

July 24, 2009
Page 3


cc:    Joshua M. Gold, Esq.
        Alan J. Kluger, Esq.

{Kluger Kaplan Litigation\0110\0375/M0650717 v.1 7/24/2009 12:57 PM }M0650570

The Miami Center • 201 S. Biscayne Blvd. • Seventeenth Floor • Miami, FL 33131 • Ph: (305) 379-9000 • Fax: (305) 379-3428



**KLUGER KAPLAN**

**Reply to:**
**MICHAEL T. LANDEN**
mlanden@klugerkaplan.com

July 24, 2009

**VIA FACSIMILE AND U.S. MAIL**
Dolphin Digital Media, Inc.
Mr. William O'Dowd IV
804 Douglas Road
Executive Tower Building, Suite 365
Coral Gables, FL 33134

> **Re:**   **Resignation from Employment with Dolphin Digital Media, Inc. –**
> **Joshua M. Gold**

Dear Mr. O'Dowd:

We represent Joshua M. Gold.  Please be advised that Mr. Gold has been forced to, and hereby does, resign from his position as Chief Compliance Officer and/or Associate General Counsel of Dolphin Digital Media, Inc. ("DDM" or the "Company") effective as of July 31, 2009, for the reasons discussed below.

Since transferring to DDM from his position as a partner-track associate at the law firm of Brown Rudnick LLP in reliance upon your representations of increased salary and professional advancement, Mr. Gold has been able to observe from an internal perspective DDM's complete lack of operational infrastructure as well as what Mr. Gold deems to be potential improprieties in your conduct as CEO of a publicly held, reporting company.  Mr. Gold was surprised at and is gravely concerned by what he has observed.  This is the primary reason underpinning Mr. Gold's decision to terminate his employment with DDM.

Mr. Gold has also advised us that in addition to your suitability as CEO of a public company and lack of focus on operational excellence, his concerns also specifically include, without limitation, that:

- DDM has no accountant keeping the books of the Company and payroll payments, which are made "by hand," have been consistently delivered late;

- Health insurance, which you represented to Mr. Gold would be 100% covered by DDM, is in fact being arranged through an affiliated privately held entity, Dolphin Entertainment, Inc., which does not employ Mr. Gold and Mr. Gold is now being asked, contrary to prior agreement, to contribute 50% of the cost of such insurance without the benefit of pre-tax payroll deductions;

- The Company's apparent policy of being a "late payer," vis-à-vis third parties, has resulted, and continues to result in, an abnormally large number of claims by many of the Company's vendors against the Company for non-payment;

July 24, 2009
Page 2

- You, as CEO, pay only sporadic and frenetic attention to the affairs of the Company resulting from time and attention dedicated to your many other business activities unrelated to the Company and other matters unknown to Mr. Gold and DDM's other employees; and

- The Company appears to be understaffed and undercapitalized with no executive management, shareholders are routinely meddling in the affairs of the Company with your knowledge and participation, and you appear to be desperately scrambling to raise additional capital to fund continued day-to-day operations, regardless of the cost or the legality of the fund raising transaction(s).

Mr. Gold has further advised us that as an inducement to encourage him to join DDM, you represented that DDM would issue him a signing bonus of 200,000 shares of the Company's common stock. To date, however, you have not provided such shares. Accordingly, please have DDM send a stock certificate representing this issuance to our office within ten (10) business days of receipt of this letter. The certificate should bear an effective date equivalent to the first date of Mr. Gold's employment with DDM.

Mr. Gold has also informed us that as part of his employment package with DDM, DDM subscribes and pays the cost of a family healthcare plan with BlueCross BlueShield of Florida, which also covers Mr. Gold's family members, Alessandra Gold, Kevin Gold and Angelina Gold. Be advised that Mr. Gold may elect to purchase COBRA coverage for his family; thus, we ask that you provide this office with the appropriate information for a COBRA election in a timely fashion so that Mr. Gold can consider the COBRA option in an informed manner and so that there is no interruption in his family's coverage, particularly since Mr. Gold has young children that require routine pediatric care.

Given the basis for Mr. Gold's decision to terminate his employment, Mr. Gold has requested that we inform you that all further correspondence from you or DDM be transmitted to this office and that no attempt to contact Mr. Gold be made directly or indirectly by you, the Company, or its agents. In addition, as is customary, we reserve all of Mr. Gold's rights at law and in equity including the right to initiate legal action against you or DDM to the extent he has suffered additional harms, which may be significant, and may include, but may not be limited to, lost business opportunities, a decline in the the price of the common stock he was to receive as a result of some of your business practices of concern to Mr. Gold, an interruption in his legal career, and attorneys fees and costs pursuant to applicable Florida law.

Very truly yours,

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.

By: _____
Michael T. Landen

{Kluger Kaplan Litigation\0110\0375/M0650717 v.1 7/24/2009 12:57 PM }M0650570

The Miami Center • 201 S. Biscayne Blvd. • Seventeenth Floor • Miami, FL 33131 • Ph: (305) 379-9000 • Fax: (305) 379-3428

July 24, 2009
Page 3


    cc:    Joshua M. Gold, Esq.
             Alan J. Kluger, Esq.

{Kluger Kaplan Litigation\0110\0375/M0650717 v.1 7/24/2009 12:57 PM }M0650570

The Miami Center • 201 S. Biscayne Blvd. • Seventeenth Floor • Miami, FL 33131 • Ph: (305) 379-9000 • Fax: (305) 379-3428



**KLUGER KAPLAN**

**Reply to:**
**MICHAEL T. LANDEN**
**mlanden@klugerkaplan.com**

July 24, 2009

**VIA FACSIMILE AND U.S. MAIL**
Dolphin Entertainment, Inc.
Mr. William O'Dowd IV
804 Douglas Road
Executive Tower Building, Suite 365
Coral Gables, FL 33134

**Re:    Resignation from Employment with Dolphin Entertainment, Inc. –
        Mark H. Peikin**

Dear Mr. O'Dowd:

We represent Mark H. Peikin. Please be advised that Mr. Peikin has been forced to, and does hereby, resign from his position as General Counsel of Dolphin Entertainment ("Dolphin") effective as of July 31, 2009, for the reasons discussed below.

After recently resigning from his position as a Partner of Brown Rudnick LLP to work for Dolphin in reliance upon your representations of increased salary and opportunity, Mr. Peikin has had the opportunity to observe your business practices from a different vantage point and your business practices cause him great concern. This is the primary reason underpinning Mr. Peikin's decision to terminate his employment with Dolphin. Mr. Peikin has also advised us that in addition to such concerns, which relate to, among other items, your ability, intention, and focus on operating actual, profitable businesses, his payroll payments have been consistently late. Mr. Peikin also advised us that he was induced by you to leave Brown Rudnick and join Dolphin in part because of your representations that you and/or Dolphin have the financial capacity to pay his agreed upon annual salary of $350,000 as well as his guaranteed bonus of $100,000 as stated in the letter agreement outlining the terms of his employment.

Mr. Peikin has further advised us that as an inducement to encourage him to join Dolphin, you represented that you would issue him upon commencement of his employment 200,000 shares of common stock in Dolphin Digital Media, Inc. ("DDM"), an affiliated company that you control. To date, however, you have not done so. Accordingly, please send a stock certificate representing this issuance to our office within ten (10) business days of receipt of this letter. The certificate should bear an effective date equivalent to the first date of Mr. Peikin's employment with Dolphin. In addition, Mr. Peikin remains entitled to his guaranteed bonus, which vested when he accepted employment with Dolphin; this bonus amount should be sent to our office forthwith.

July 24, 2009
Page 2

We also understand that you and Mr. Peikin embarked on a new joint venture called Dolphin Entertainment Capital, Inc. ("DEC" or the "Company"). With your full knowledge and approval, Mr. Peikin has performed the majority of the work on behalf of DEC and has informed us that DEC has generated income to date of $25,000 pursuant to a contract valued at not less than $65,000 and that per agreement with you his expense allowance of $2,500 per month should be deducted against such earnings prior to any distributions. Please be advised that we are also representing the interests of Mr. Peikin with respect to DEC.

Mr. Peikin would like us to obtain your consent to dissolve DEC. If you would like to purchase Mr. Peikin's interests in DEC rather than assent to the dissolution of the Company, Mr. Peikin has advised us that he will entertain a reasonable purchase proposal should you desire to make such a proposal so long it is received by our office within ten (10) business days from your receipt of this letter. If we do not receive any correspondence from you during this period, we will accept your silence as a clear expression of your assent to the dissolution of the Company. Should you decide not to consent to dissolve the Company, we will seek appropriate legal recourse, including, without limitation, judicial dissolution, or, in lieu of dissolution, to establish and enforce Mr. Peikin's rights to income from all future earnings of the Company.

Mr. Peikin has also informed us that as part of his employment package with Dolphin, Dolphin subscribes and pays the cost of a family healthcare plan with BlueCross BlueShield of Florida, which also covers Mr. Peikin's family members, Jarvey Mesina and Nathaniel Peikin. Be advised that Mr. Peikin may elect to purchase COBRA coverage for his family and we ask that you provide this office with the appropriate information for a COBRA election in a timely fashion so that Mr. Peikin can consider the COBRA option in an informed manner and so that there is no interruption in his family's coverage, particularly since Nathaniel is less than two years old and requires routine pediatric care.

Given the basis for Mr. Peikin's decision to terminate his employment, Mr. Peikin requests that all further correspondence from you, Dolphin, or its agents be transmitted to this office. In addition, as is customary, we reserve all of Mr. Peikin's rights at law and in equity including the right to initiate legal action against you or Dolphin to the extent he has suffered additional harms, which may be significant, and may include but may not be limited to lost business opportunities, a decline the in the price of the common stock he was to receive as a result of some of your business practices of concern to Mr. Peikin, and an interruption in his highly successful legal practice, which he has been building since 1998, as well as attorneys fees and costs incurred by Mr. Peikin pursuant to Florida law.

Very truly yours,

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.

By: _____
          Michael T. Landen

{Kluger Kaplan Litigation\0110\0375/M0650718 v.1 7/24/2009 12:59 PM }M0650589

The Miami Center • 201 S. Biscayne Blvd. • Seventeenth Floor • Miami, FL 33131 • Ph: (305) 379-9000 • Fax: (305) 379-3428

July 24, 2009
Page 3

cc:   Mark H. Peikin, Esq.
       Alan J. Kluger, Esq.

{Kluger Kaplan Litigation\0110\0375/M0650718 v.1 7/24/2009 12:59 PM }M0650589

The Miami Center • 201 S. Biscayne Blvd. • Seventeenth Floor • Miami, FL 33131 • Ph: (305) 379-9000 • Fax: (305) 379-3428

EXHIBIT E



# bespoke
## GROWTH PARTNERS

MERCHANT BANKERS

INVESTOR RELATIONS

CORPORATE ADVISORS

This presentation is provided for informational purposes only. The examples contained herein are merely illustrative and past performance is not determinative of future results. Each Company and its requirements is unique; this is why Bespoke provides custom tailored solutions structured by professionals.



# bespoke
GROWTH PARTNERS

# Custom Solutions

Business Structure and Market Advice

Your Company

Merchant Banking

Targeted Approach to IR / Inspire Active Investors





**Custom Solutions**

Every Company is unique. Management knows best.

**Market**

Management is ready to approach the investor community.

**Achieve the Goal**

Timing is everything. Transactions must close quickly; market support is key.

Custom Solutions



GROWTH PARTNERS

# Prospective Client Profile

➤ Publicly traded company with well thought out capital structure and strong management

➤ At break-even or positive EBITDA or is in a sector with significant growth potential

➤ Non-sector specific but we have a track record of success working with companies in the areas of Technology, Web 2.0, Renewable Energy, Security, Life Sciences/Bio-Medical, Apparel/Shoes/Retail, Natural/Energy Foods



**bespoke**
GROWTH PARTNERS

# Investor Relations

- Growth companies need accurate and consistent communication with their shareholders and an efficient program for sharing of information

- Young public companies must be careful to avoid missteps that could reduce confidence in the market

- We provide a full services approach to shareholder communications and our relationships help our clients efficiently build a significant shareholder base and trading liquidity in their securities



# bespoke
### GROWTH PARTNERS

# Investor Relations

- ∇ Regular communications with retail broker network
- ∇ Ongoing trading support
- ∇ Introductions to High Net Worth and Institutional Investors
- ∇ Advice concerning and coordination of shareholder communications including social media and reports
- ∇ Facilitate execution of special circumstances stock trades
- ∇ Advice regarding marketplace considerations
- ∇ Deal structuring and coordination with investment banking activities



# Targeted IR Program





Active Retail
Stock Buying

High Net Worth and
Institutional Investors

Shareholder Interaction
and Communications

Retail and
Institutional Road
Shows



# Contact Bespoke

## Bespoke Growth Partners, Inc.

228 Park Avenue South, Suite 34215

New York, NY 10003

Mark H. Peikin, CEO

1 (800) 805 -1695 – Ext 1 (p)

1(800) 805 -1622 (f)

EXHIBIT F

Subject: Re: We can only do the call at 4:45 PM


Thanks, Terry.


Please do not send anything to Bill
directly until we have our agreement in place between Rite and bespoke.


Speak to you at 4:00 PM.


Thanks,

JOSHUA


On Tue, May 12, 2009 at 1:04 PM, <tfeeley@rite-solutions.com>
wrote:

that looks good.....same number

-----Joshua Gold <joshuamgold@gmail.com>
wrote: -----


To: Terry Feeley <tfeeley@rite-solutions.com>

From: Joshua Gold <joshuamgold@gmail.com>

Date: 05/12/2009 12:21PM

Subject: We can only do the call at 4:45 PM



Will this work for you?


JOSHUA

EXHIBIT G

From:
Terry Feeley/RITE

To:
Joshua Gold <joshuamgold@gmail.com>

Cc:
Terry Feeley <tfeeley@ritesolutions.com>

Date:
05/13/2009 08:24 AM

Subject:
Re: some detail for you


Hello Josh


I will call you after my call with BP
is completed.


I have not had a change of heart in
working with BESPOKE and I would never tell Bill anything....that is
none

9

of my business


That is not my style


If the agreement you and Mark have put
together meets my concerns we can sign it...if not we will not


please send it to me

thanks

Terry




From:
Joshua Gold <joshuamgold@gmail.com>

To:
tfeeley@rite-solutions.com

Date:
05/13/2009 08:12 AM

Subject:
Re: some detail for you




Thank you terry. I have forwarded your email to Mark without
our prior correspondence so that he, too may understand better the
current
situation.


You understand the position I am in at this juncture.
Mark had asked me to request that the contract be concluded prior to the
deal with Dolphin being=2
0struck only because he had drafted something
that reflected your email regarding Bespoke providing barter-trade
related
services. I do not believe there was ever any disagreement that however
we structured the deal, it would have to be in a way that Rite could
accept.
I know Mark's intention was not to use the business prospect as a lever
to obtain an unwanted or risky agreement from Rite. He only wanted to
put
in place what you had suggested and with which we agreed.

Mark now feels that there has been a change of heart and
that you intend on informing Bill regarding our request for what we all
feel is earned value compensation. He blames me in large part for this
situation and perhaps I should take some of the blame for not
seeing the misunderstanding mount and/or properly managing it. However,
it is very dangerous for me and my family to have Mark feel that he
cannot
trust me and/or the persons I introduce to him as Mark is essentially my
employer and boss. I am not saying that you are not trustworthy. Au
contraire.
Knowing you the way I think I do, I know that you are one of the most
trustworthy
people I will ever know.


How do we fix this so that what started off good and positive
can end that way? Again, I would ask that any reply to this email not be
copied to Mark. It would be very detrimental to me.

    JOSHUA




On Wed, May
13, 2009 at 7:36 AM, <tfeeley@rite-solutions.com>
wrote:

Hello Josh

I have been asked to participate in a conf call with BP in the UK at
7:30
this morning..I will contact you when it is done to check your
availability
for a call


The issue we are not aligned is that you and Mark are pushing for a
signed
agreement before Rite does business with Dolphin and that is not going
to happen...We will sign an agreement when we have worked out the
business
mechanics that meet everybody's needs without creating unintended
results

We will honor what we agreed to with Dolphin


I know you do not understand what the issues for Rite are and that is
because
you do not have all the information to understand it

I will give you one example....Rite manages the financial transactions
for TS in NY.  Last year $1,400,000,000 flowed through the system.
Our agreement with the Onida Nation allows Rite to work the float of
about
$500.000.000 at any given time.  It is a revenue sharing plan based
on Rite ensuring that the gaming solutions in the Casino are always
state
of the art....

Rite has to sign a certification letter every 6 months relative to our
rates.  If any discrepancies show up in thi area via an audit we lose
the privilege of manageing the float for 90 days


Thanks

Terry

-----Joshua Gold <joshuamgold@gmail.com>
wrote: -----

=0
A

To: tfeeley@rite-solutions.com

From: Joshua Gold <joshuamgold@gmail.com>

Date: 05/12/2009 08:12PM

Subject: Re: go/no go time


Thanks, Terry. I just wish we could have discussed it on the phone you
and I before having emails like that sent to Mark.


We had always been aligned with your
suggested business model. I'm not sure what went wrong here.


JOSHUA


On Tue, May 12, 2009 at 8:06 PM, <tfeeley@rite-solutions.com>
wrote:

Hello Josh

It is salvageable  if it is honest and transparent  and if it
is not..it will never happen

thanks

Terry

-----Joshua Gold <joshuamgold@gmail.com>
wrote: -----


To: tfeeley@rite-solutions.com

From: Joshua Gold <joshuamgold@gmail.com>

Date: 05/12/2009 07:52PM

Subject: Re: go/no go time


Terry--I am writing this email to you privately. Please do not disclose
to Mark.


I fear there has been a confusion which
for some reason has been blown out of proportion in your head.


Mark has prepared a form of agreement
which is precisely what we discussed and with which you were comfortable
and was to send that today so that we had it in place for the Dolphin
deal.
He is traveling now and has been pondering your last email and so has
not
yet sent it. We have always been open to discuss and to adopt whatever
structure going forward would work for you=2
0and compensate everyone for
value delivered and earned. It has nothing to do with greed or a desire
to con anyone.


We just wanted to have one 5 minute
conversation with you on strategy and to review the proposal before it
went out as part of the team. I reviewed the Hasbro proposal for
I.F./Community
Watchdog prior to it being shared with either I.F. or Hasbro. In this
case,
Mark knows the client very well and could have added some value there as
he knows how Bill ticks and how to make sure we got the deal. No other
reason.


I fear that email as a medium made this
seem much more confused and volatile than it had to be. I am just afraid
that your harsh emails may have offended Mark. Honestly, I think it
was unnecessary and
we'd have done better with a 5 minute call. None of this
misunderstanding
would have loomed so large.


We want what is best for the company
and what is best for us. We did not come to Rite with the idea that we
could make DPDM into a cash cow for us. We simply wanted to save the
company
 from shareholders like Malcolm (Bill is incapable of doing this or
seeing
the danger) and being fairly compensated for it.


I am befuddled at how we have arrived
at this point. I hope is is salvageable as I sincerely felt we
could benefit each other mutually not only on this deal but into the
future.

```
=0
AI will try to see if Mark will do a
call at 7:30.
```

Let's try to make this happen.


JOSHUA


On Tue, May 12, 2009 at 7:20 PM, <tfeeley@rite-solutions.com>
wrote:

Hello Josh and Mark


I am not sure what we need to discuss..I have come to the conclusion
that
there is little chance that this is going to happen.. I would love to
see
it happen but I have no desire to be be a fool or play one on TV or put
a lifetime of work at risk for someone else's greed.  When you can
tell Bill what you are doing come back and see me...if you can't...get
a good lawyer


I wish you both k the best...but I am not interested in this
childishness
and never will be ...long live the King...long live the Con Artist


I will be in my office at 7:30am tomorrow...call me if you wish to
speak...if
I do not hear from you I will send the proposal to Bill because we owe
him that and you guys can tell him it is a bad deal as his trusted
advisers...end
of story and we all go forward as we were doing before


Rite has too much to do than dally with this.crap ..I tried to share
that
with you but clearly I was not successful

thanks for the opportunity

all the best

Terry


-----Joshua Gold <joshuamgold@gmail.com>
wrote: -----


To: tfeeley@rite-solutions.com

From: Joshua Gold <joshuamgold@
gmail.com>

Date: 05/12/2009 04:46PM

Cc: Mark Peikin <celebfinancial@yahoo.com>

Subject: Re: go/no go time

Can we get on the phone for five minutes?

On Tue, May 12, 2009 at 4:42 PM, <tfeeley@rite-solutions.com>
wrote:

Hello Josh and Mark

send up what you have  for me to look at ...I have made it clear what
the business model will  need be to meet everyone's  needs at
this time...

If that model does not work .for Bespoke ..we can stop now ...it is
fairly
black and white...Rite does not need this business and we will not put
our government or casino  business at risk for any reason. If you
wish to make a Rite proposal to Dolphin contingent on a signed deal
between
Rite and Bespoke being in place it is highly unlikely that this will
happen
in time to get started on the work to launch the site by Aug 15.
There will also be no need for Jeremy to visit us tomorrow.

Going forward I can put a revenue sharing model in place that will
address
all the issues and remove the documentation complexity that is
concerning
Bespoke. The simple truth is that Rite's business base between the
government
and casinos is strong enough that  unless BESPOKE can contractually
commit to a min of $500,000,000 in cash flow to Rite each year this is
the way it will be ..It is plain and simple

please advise if you wish to proceed0D

thanks

Terry

-----Joshua Gold <joshuamgold@gmail.com>
wrote: -----

To: tfeeley@rite-solutions.com,
Mark Peikin <celebfinancial@yahoo.com>

From: Joshua Gold <joshuamgold@gmail.com>

Date: 05/12/2009 01:43PM

EXHIBIT H

## BUSINESS REFERRAL AGREEMENT

This Business Referral Agreement (the **"Agreement"**) is made and is effective as of this _____ day of July, 2009 (the **"Effective Date"**), by and between **Rite Solutions, Inc.** (**"Rite"**), a Rhode Island corporation whose mailing address is 88 Silva Lane, Street, Suite 220 East, Middletown, RI 02842, and **gsquared ltd.**, a Rhode Island corporation whose mailing address is 11015 NW 49th Drive, Coral Springs, FL 33076 ("**gsquared**"). For illustrative purposes a party who generates a sales lead for the other may be referred to herein as the "Lead Provider," and the party who receives a sales lead generated by the other may be referred to herein as the "Lead Receiver."

1. **Compensation.** Subject to the terms of this Agreement, Lead Receiver will compensate Lead Provider for actual sales of Lead Receiver's goods and services to clients (each a **"Client,"** and collectively, the **"Clients"**) resulting from sales leads (**"Leads"**) generated by a Lead Provider.

2. **Areas of Interest:** Without limitation, Rite and gsquared will explore opportunities in the following areas:

- Licensing
- Management consulting
- Business and corporate development
- Strategic planning
- Business & product development
- Branding & marketing
- Independent research
- Strategic partnerships
- Vendor due diligence
- Corporate governance

3. **Submission of Leads.** All Leads shall be submitted via e-mail, if to Rite, at: tfeeley@rite-solutions.com, and if to gsquared, at: Joshuamgold@gmail.com.

4. **Exclusions.** Lead Provider shall be compensated only for Leads that Lead Receiver accepts after determining that the prospective Client is neither an existing client nor an already existing prospective client; and (2) orders new goods and services from Lead Receiver within twenty-four (24) months of the referral.

5. **Inclusions.** This Agreement specifically includes gsquared's introduction to Rite of Dolphin Digital Media, Inc. (including subsidiaries and affiliates, **"DPDM"**). All fees generated by Rite from or in collaboration with DPDM even if generated under an agreement entered into prior to the date of this Agreement.

6. **Client Billing**: Unless otherwise agreed to by gsquared, Rite may only quote Clients on a "time and materials" basis and not at a fixed price. Gsquared has agreed to waive this requirement with respect to Rite's contract with DPDM to rebuild Dolphin Secure to the

extent it has already been quoted and billed at a fixed price.

7. **Payment.** Lead Provider will earn a commission from each Lead that becomes Client of Lead Receiver as follows: thirty percent (30%) of all fees received from Clients (the "Commission"). The Commission shall be payable by the Lead Receiver within fifteen (15) business days from the date revenues subject to this agreement are received.

8. **Nature of Relationship.** Neither Rite nor gsquared shall have the authority to bind the other by contract or otherwise or to make representations as to the policies or procedures of the other except as specifically authorized by this Agreement. Rite and gquared acknowledge and agree that their relationship arising from this Agreement does not constitute or create a general agency, joint venture, partnership, employee relationship or franchise between them and that each is an independent contractor with respect to the products provided by it under this Agreement. Each of Rite and gsquared assumes full responsibility for the acts of its employees and for their supervision, daily direction and control.

9. **No Representations or Warranties.** Neither party its respective employees shall make any representations or warranties relating to the other.

10. **Trademarks.** This Agreement shall not grant a Lead Provider any right to use the trademark(s) of the Lead Receiver without the prior express written permission of the Lead Receiver.

11. **Confidential Information.** Any confidential information, including specifications, drawings, sketches, data or technical or business information, and any other confidential material, as well as all Lead or Client information (collectively, the "**Information**"), furnished by a disclosing party to a receiving party is to be used by the receiving party solely in the performance of its obligations and duties hereunder and is to be returned to corporate headquarter of the digital media department.

12. **Term.** This Agreement shall commence on the Effective Date and shall continue indefinitely until terminated in accordance herewith.

13. **Termination.** This Agreement may be terminated at any time by either party on thirty (30) days prior written notice to the other. Upon termination of this Agreement, Rite shall remain bound to pay to Lead Provider all commissions earned through termination as well as any future commissions relating to Clients acquired by Rite prior to termination, even if not yet earned by termination. Lead Provider shall also be entitled to its commission with respect to any new Clients acquired by Rite within six (6) months following termination.

14. **Notices.** All notices to be given pursuant to this Agreement will be in writing made via e-mail to the person indicated in Section 3 of this Agreement

15. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior agreements and representations, written or oral, concerning the subject matter of this Agreement.

Executed by the duly authorized officers below as of the date first set forth above.

**GSQUARED LTD**

_____

**JOSHUA M. GOLD, CEO**

**RITE SOLUTIONS, INC.**

_____

**JAMES LAVOIE, CEO**

EXHIBIT I

**Dolphin Digital Media, Inc.**

Unanimous Written Consent of the Sole Director in Lieu of a
Special Meeting of the Board of Directors

The undersigned, being all the directors of Dolphin Digital Media Inc., a Nevada corporation (the "**Corporation**"), do hereby waive notice and consent, pursuant to Nevada Revised Statutes, Sections 78.315 and 78.325, to the adoption of the following resolutions in lieu of holding a meeting of the Board of Directors (the "**Board**") of the Corporation with the same force and effect as if duly adopted at a special meeting of the Board called for the purpose:

NOW BE IT,

**RESOLVED:**    That it is in the best interest of the Corporation that the Corporation be and hereby is authorized to enter into a Consulting Agreement by and between the Corporation and Carta de Dinero LLC ("Carta"), dated as of January 1, 2009 and lasting for a duration of six (6) months (the "Consulting Agreement") subject to cancellation and renewal provisions to be negotiated, and to issue to Carta an aggregate of five hundred thousand (500,000) shares of restricted Common Stock of the Corporation as compensation for certain advisory and consulting services to be rendered pursuant to the Consulting Agreement, payable to Carta as per the terms and conditions of the Consulting Agreement.

**RESOLVED:**    That the officers empowered under the By-Laws of the Corporation be, and each of them acting singly hereby is, authorized to execute a document effectuating a renewal of the Consulting Agreement as per the previous resolution and to execute and deliver to Carta one or more certificates for an aggregate of five hundred thousand (500,000) shares of restricted Common Stock, and that when issued and delivered in accordance with the foregoing, the aforementioned shares of restricted Common Stock shall be deemed fully paid and non-assessable.

**RESOLVED:**    That the officers empowered under the By-Laws of the Corporation be, and they hereby are, and each of them acting singly hereby is, authorized to negotiate, execute and deliver all such instruments and documents, make all such payments, make all such filings pursuant to state securities laws or otherwise and do all such other acts and things as in their opinion, or in the opinion of any of them, may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolutions; and that all such acts and things heretofore done by such officers, and any one or more of them acting alone, in connection with and in furtherance of the purposes and intent of the foregoing resolutions be, and they hereby are, ratified, confirmed and approved as the act and deed of the Corporation.

**[Signature Page Follows]**

This Unanimous Written Consent of the Sole Director in Lieu of a Special Meeting of the Board of Directors is hereby executed, effective as of the date set forth below.

Dated as of:  December 22, 2008

William H. O'Dowd IV

Michael Espensen

EXHIBIT J

**Dolphin Digital Media, Inc.**

Unanimous Written Consent of the Sole Director in Lieu of a
Special Meeting of the Board of Directors

The undersigned, being all the directors of Dolphin Digital Media Inc., a Nevada corporation (the "**Corporation**"), do hereby waive notice and consent, pursuant to Nevada Revised Statutes, Sections 78.315 and 78.325, to the adoption of the following resolutions in lieu of holding a meeting of the Board of Directors (the "**Board**") of the Corporation with the same force and effect as if duly adopted at a special meeting of the Board called for the purpose:

NOW BE IT,

**RESOLVED:**      That it is in the best interest of the Corporation that the Corporation be and hereby is authorized to renew for one additional six (6) month term that certain Consulting Agreement by and between the Corporation and Carta de Dinero, LLC ("Carta") dated as of January 1, 2009, and to issue to Carta an additional five hundred thousand (500,000) shares of restricted Common Stock as compensation for the consulting services to be rendered pursuant thereto, such shares of Common Stock to be payable to Carta as per the terms and conditions of such Consulting Agreement as so renewed.

**RESOLVED:**      That the officers empowered under the By-Laws of the Corporation be, and each of them acting singly hereby is, authorized to execute a document effectuating a renewal of the Consulting Agreement as per the previous resolution and to execute and deliver to Carta one or more certificates for an aggregate of 500,000 shares of restricted Common Stock, and that when issued and delivered in accordance with the foregoing, the aforementioned shares of restricted Common Stock shall be deemed fully paid and non-assessable.

**RESOLVED:**      That the officers empowered under the By-Laws of the Corporation be, and they hereby are, and each of them acting singly hereby is, authorized to negotiate, execute and deliver all such instruments and documents, make all such payments, make all such filings pursuant to state securities laws or otherwise and do all such other acts and things as in their opinion, or in the opinion of any of them, may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolutions; and that all such acts and things heretofore done by such officers, and any one or more of them acting alone, in connection with and in furtherance of the purposes and intent of the foregoing resolutions be, and they hereby are, ratified, confirmed and approved as the act and deed of the Corporation.

**[Signature Page Follows]**

This Unanimous Written Consent of the Sole Director in Lieu of a Special Meeting of the Board of Directors is hereby executed, effective as of the date set forth below.

Dated as of: June 15, 2009

_____
William H. O'Dowd IV

_____
Michael Espensen

EXHIBIT K



OFFICE OF THE GENERAL COUNSEL

804 Douglas Road
Executive Tower Building, Suite 365
Coral Gables, FL 33134

T: 305.774.0407
F: 305.774.0405

www.dolphindigitalmedia.com

July 8, 2009

**VIA OVERNIGHT COURIER**
Nevada Agency and Transfer Company ("NATCO")
50 West Liberty Street, Suite 880
Reno, Nevada 89501
Telephone (775) 322-0626
Attn: Ms. Mary Ramsey

RE:  **Irrevocable instructions to NATCO to issue (i) 500,000 common shares of Dolphin Digital Media, Inc. ("DPDM") to Carta de Dinero LLC ("Carta") from DPDM's duly authorized free trading common shares in the same name without restrictive legend, (ii) an additional 500,000 restricted common shares to Carta; and  (iii) 86,000 restricted common shares to RedChip Companies, Inc. ("RedChip") as indicated in that certain Share Issuance Resolution dated as of June 15, 2009**

Dear Mary:

This letter of instruction is issued pursuant to the following unanimous resolutions of the Board of Directors of DPDM, duly resolved and issued (the "Resolutions," copies of which are attached hereto and deemed incorporated herein as if set forth at length):

- That certain 'Unanimous Written Consent of the Sole Director in Lieu of a Special Meeting of the Board of Directors' dated as of December 22, 2008, authorizing the issuance of five hundred thousand (500,000) common shares of DPDM to Carta de Dinero LLC ("Carta") as compensation under that certain Consulting Agreement between DPDM and Carta dated as of January 1, 2009 (the "Consulting Agreement"); and

- That certain 'Unanimous Written Consent of the Sole Director in Lieu of a Special Meeting of the Board of Directors' dated as of June 15, 2009, authorizing the issuance of (i) an additional five hundred thousand (500,000) common shares of DPDM to Carta as compensation under an approved extension of the Consulting Agreement; and (ii) eighty-six thousand (86,000) common shares of DPDM to RedChip Companies, Inc. ("RedChip") as compensation for certain Investor Relations Services rendered as part of a general engagement between DPDM and RedChip for such services.

Pursuant to the Resolutions and with the full authorization of the Board of Directors of DPDM, the undersigned does hereby instruct NATCO to issue an aggregate amount of 1,086,000 shares of DPDM's common stock (the "Shares") only as set forth in the attached NATCO form of "Share Issuance Resolution," which shall be deemed to be incorporated herein as if set forth at length.

1

DPDM hereby indemnifies NATCO for any and all loss, liability or expense in carrying out original issuance requests in reliance on the authenticity of the signature on the Share Issuance Resolution. The Company hereby agrees that its indemnification of Nevada Agency and Transfer Company set forth herein is irrevocable.

DPDM acknowledges that with respect to a certain part of the Shares to be issued pursuant hereto, such Shares are not registered for sale under the Securities Act of 1933, as amended, and any request for the subsequent transfer of such Shares by the recipient must be accompanied by an opinion from DPDM's or the recipient's counsel that the transfer is pursuant to an available exemption under the Securities Act of 1933, as amended. The certificates for such Shares only shall bear the following legend, or its equivalent:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL, IN A FORM REASONABLY ACCEPT-ABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT."

Once issued, the Shares should be expedited via national overnight courier to the mailing address(es) listed in the "Share Issuance Resolution" attached hereto. **Please contact the undersigned at (401) 864-4471 for credit card information to cover payment for all processing and legend removal fees, as well as expedited overnight courier charges.**

We trust that the above instructions are clear and that the Shares shall be issued forthwith upon receipt by NATCO of this letter. Please let us know immediately if there are any questions or if further information or documentation is required.

Thank you and regards,

Joshua M. Gold
Associate General Counsel
As Authorized Signer

2



**OFFICE OF THE GENERAL COUNSEL**

804 Douglas Road
Executive Tower Building, Suite 365

T 305.774-0407
F 305.774-0405

www.dolphindigitalmedia.com

## RULE 144 OPINION
## OMISSION OF RESTRICTIVE LEGEND
## NON-AFFILIATE

July 8, 2009

**VIA OVERNIGHT COURIER**
Nevada Agency and Transfer Company ("NATCO")
50 West Liberty Street, Suite 880
Reno, Nevada 89501
Telephone (775) 322-0626
Attn: Ms. Mary Ramsey

RE:  Omission of restrictive legend from certificate for 500,000 shares of common stock of Dolphin Digital Media, Inc. ("DPDM" or the "Company") to be issued from DPDM's duly authorized free trading common shares  to Carta de Dinero LLC in to the same name without restrictive legend

Dear Mary,

DPDM has requested that we render an opinion with respect to the proposed issuance to Carta de Dinero LLC ("Carta") of a certificate from Treasury representing five hundred thousand (500,000) shares of the duly authorized free trading common stock of DPDM owed to Carta as compensation for professional advisory and consulting services rendered, into the same name without the inclusion of a legend thereon restricting transfer of said shares.

In connection with this opinion we have reviewed that certain letter dated as of even date herewith from Carta containing certain representations that shall be deemed to be incorporated herein as if set forth at length (the "Shareholder's Representation Letter").

The opinions herein expressed are based solely upon (a) our review of the Shareholder's Representation Letter, and (b) such review of published sources of law as we deemed necessary.

Based upon and subject to the foregoing, we are of the opinion that the shares may be issued to Carta as free trading shares into the same name without registration pursuant to Rule

1

144(b)(1) and that accordingly, the restrictive legend that would otherwise appear on restricted stock may be omitted.

Upon receipt by you of appropriate issuance instructions, you shall be duly authorized to issue the free trading shares and to record them on DPDM's books, and to effect the transfer of duly authorized free trading shares as requested and issue a new certificate into the same name in accordance with the transfer instructions, free of any restrictive legend on the certificate.

This opinion may only be relied on by the Company and by the Company's transfer agent.

Thank you and regards,

Joshua M. Gold
Associate General Counsel

2

# SHARE ISSUANCE RESOLUTION
### (CORPORATE RESOLUTION AUTHORIZING ORIGINAL ISSUANCE SHARES)
### (Tab Through and Overwrite To Update)

### NAME OF COMPANY
### CLASS OF STOCK (COMMON, PREFERRED, WARRANTS)

RESOLVED: THE BOARD OF DIRECTORS OF THE ABOVE CAPTIONED COMPANY HAS TAKEN ALL ACTION REQUIRED BY LAW TO AUTHORIZE AND INSTRUCT NEVADA AGENCY AND TRANSFER COMPANY, THE STOCK TRANSFER AGENT FOR THE ABOVE CLASS OF STOCK FOR THE ABOVE COMPANY, TO ISSUE THE SHARES DESCRIBED BELOW AND INCREASE THE OUTSTANDING SHARES ON THE BOOKS OF THE COMPANY.

**ISSUANCE INSTRUCTIONS**                    SEE ATTACHED

| Name<br>Address<br>Address<br>Social/ FEIN | Number of<br>Shares | Certificate<br>Date | Restricted or Free<br>Trading? What type<br>of Restriction (Reg<br>"S" or 144) | Free Trading Exemption (Required<br>if Free Trading*) |
|---|---|---|---|---|

☑ See Attached List for Additional Issues

## NOTE: SOCIAL SECURITY NUMBER OR TAX IDENTIFICATION REQUIRED ON ALL ISSUANCES!

*The company understands and agrees that instructions directing the original issuance of shares as free trading must be accompanied by an opinion of counsel opining on the availability of claim exemption and legality and validity of the issuance. Otherwise all certificates representing shares issued shall bear restrictive legends.

THESE INSTRUCTIONS SHALL INCREASE THE NUMBER OF SHARES OUTSTANDING BY **000,000** SHARES.

I, THE UNDERSIGNED, AM A QUALIFIED AND DULY ELECTED OFFICER OF THE ABOVE NAMED COMPANY, AND I DO HEREBY CERTIFY THAT: (1) THE ABOVE NAMED COMPANY IRREVOCABLY INDEMNIFIES NEVADA AGENCY AND TRANSFER COMPANY AND THEIR EMPLOYEES AGAINST ANY AND ALL CLAIMS FOR ACTIONS TAKEN BY THE ABOVE COMPANY REGARDING THE ABOVE RESOLUTION; (2) THIS IS A TRUE AND CORRECT COPY OF A RESOLUTION ADOPTED BY THE COMPANY'S BOARD OF DIRECTORS ON THE BELOW DATE, AND THAT THE SAID RESOLUTION HAS NOT BEEN IN ANY WAY RESCINDED, ANNULLED, OR REVOKED BUT THE SAME IS STILL IN FULL FORCE AND EFFECT; (3) THE SHARES SUBJECT TO THIS RESOLUTION HAVE BEEN ALLOTTED AND THAT THE CORPORATION HAS RECEIVED THE FULL CONSIDERATION FOR SUCH SHARES AND THAT SUCH SHARES ARE THEREFORE FULLY PAID AND NON-ASSESSABLE; AND (4) THE ABOVE NAMED COMPANY RELIEVES NEVADA AGENCY AND TRANSFER COMPANY FROM ANY AND ALL LIABILITIES IN CONNECTION WITH THIS TRANSACTION.

X _William F. O'Dowd_                    _William H. O'Dowd_
**OFFICER'S SIGNATURE**                    **OFFICER'S NAME PRINTED**

_CEO_                                     _6/15/09_
**TITLE OF OFFICER**                       **DATE**

_305-774-0407_                            _305-774-0405_
**TELEPHONE NUMBER**                       **FACSIMILE NUMBER**

## NOTE: IF MAILING INSTRUCTIONS ARE NOT PROVIDED, ALL CERTIFICATES WILL BE SHIPPED TO THE COMPANY ADDRESS

**COMPANY NAME / ATTENTION**   - Mailing Instructions
**MAILING ADDRESS**                              **EXPRESS OR**                **ACCOUNT NUMBER**

NEVADA AGENCY AND TRANSFER COMPANY
50 WEST LIBERTY STREET, SUITE 880
RENO NV 89501

E-MAIL: INFO@NATCO.ORG
TELEPHONE (775) 322-0626
FAX (775) 322-5623

Name

Address

Address

☑ FEDEX EXPRESS
☐ UPS
☐ DHL
☐ FEDEX GROUND

Courier Account Number

NEVADA AGENCY AND TRANSFER COMPANY
50 WEST LIBERTY STREET, SUITE 880
RENO NV 89501

E-MAIL: INFO@NATCO.ORG
TELEPHONE (775) 322-0626
FAX (775) 322-5623



OFFICE OF THE GENERAL COUNSEL

804 Douglas Road
Executive Tower Building, Suite 365

T 305.774-0407
F 305.774-0405

www.dolphindigitalmedia.com

## ATTACHMENT TO SHARE ISSUANCE RESOLUTION

Reference is hereby made to that certain Share Issuance Resolution of Dolphin Digital Media, Inc. dated as of June 15, 2009 (the "Resolution").

Below are the Share Issuance Instructions duly authorized by the Resolution and referenced thereby:

| Company | Number of Shares | Certificate Date | Restriction Type | Exemption Type |
|---|---|---|---|---|
| (1) RedChip Companies, Inc. TIN: 203 64 9907<br><br>Corporate and mailing address: 500 Winderley Pl., Suite 100 Maitland, FL 32751 | 86,000 | Effective Date: 7/8/09 | Reg. 144 | N/A |
| (2) Carta de Dinero LLC TIN: 205 77 9220<br><br>Corporate address: 1012 N. Rowan Ave. Los Angeles, CA 90063<br><br>Mailing address: C/O Merrill Lynch Attn: Ramy Assaf 153 East 53rd Street, 47th Fl. New York, NY 10022 | 500,000 | Effective Date: 12/22/08 | N/A | Reg. 144 |
| (3) Carta de Dinero LLC (Same information as above) | 500,000 | Effective Date: 6/15/09 | Reg. 144 | N/A |

## NON-AFFILIATE SHAREHOLDER REPRESENTATION LETTER

Date:   July 8, 2009

Nevada Agency and Transfer Company:

The undersigned Carta de Dinero LLC, is the owner of 500,000 shares of the common stock ("the Stock") of Dolphin Digital Media, Inc. ("Dolphin Digital Media" or "the Company"). The purpose of this letter is to induce you to allow the issuance of a certificate to the undersigned in the same name evidencing the Stock without the standard "restrictive" legend. In order to induce you to remove this "restrictive" legend, the undersigned represents to you that:

1.   The undersigned's date of acquisition was 12/22/2008 (date consideration delivered for Stock) and;

•   the Company is a reporting company and the undersigned acquired the shares at least *six months ago*. The last public information filed by the company was the Company's 10-Q filed on 5/15/2009;

•   to the undersigned's knowledge, the Company is not and never has been a shell issuer as described in Rule 144(i)(1).

2.   The undersigned is not now, and has not been during the preceding three months, an officer, director or more than 10% shareholder of the Company or in any other way and "affiliate" of the company as that term is defined in Rule 144(a)(1).

3.   The undersigned is unaware of any material adverse information with regard to the Company that has not been publicly disclosed.

In light of the foregoing, please issue to Carta de Dinero LLC ("Carta"), from the Company Treasury, a certificate representing five hundred thousand (500,000) free trading common shares of DPDM in reliance upon Rule 144 under the Securities Act of 1933 so that the Stock may be free to sell without restriction and return a certificate in the same name clear of any restrictive legend based on the information provided above. The undersigned understands and is familiar with Rule 144, agrees that the information given above may be relied upon and to indemnify you for any liability arising out of the foregoing representation.

The undersigned understands that Dolphin Digital Media will pay the fee associated with the transfer, all new certificate(s) issued, all applicable legend removal fees and all overnight courier fees. Carta expressly requests and Dolphin Digital Media has approved that such certificate(s) be sent to our broker C/O Merrill Lynch, Attn: Ramy Assaf, 153 East 53rd Street, 47th Floor, New York, NY 10022, and to pay any and all fees associated with expediting this request.

Carta de Dinero LLC

*Arturo P. Chayra*
(Signature)

Arturo P. Chayra III

**Dolphin Digital Media, Inc.**

Unanimous Written Consent of the Sole Director in Lieu of a
Special Meeting of the Board of Directors

The undersigned, being all the directors of Dolphin Digital Media Inc., a Nevada corporation (the "**Corporation**"), do hereby waive notice and consent, pursuant to Nevada Revised Statutes, Sections 78.315 and 78.325, to the adoption of the following resolutions in lieu of holding a meeting of the Board of Directors (the "**Board**") of the Corporation with the same force and effect as if duly adopted at a special meeting of the Board called for the purpose:

NOW BE IT,

**RESOLVED**:     That it is in the best interest of the Corporation that the Corporation be and hereby is authorized to enter into a Consulting Agreement by and between the Corporation and Carta de Dinero LLC ("Carta"), dated as of January 1, 2009 and lasting for a duration of six (6) months (the "Consulting Agreement") subject to cancellation and renewal provisions to be negotiated, and to issue to Carta an aggregate of five hundred thousand (500,000) shares of restricted Common Stock of the Corporation as compensation for certain advisory and consulting services to be rendered pursuant to the Consulting Agreement, payable to Carta as per the terms and conditions of the Consulting Agreement.

**RESOLVED**:     That the officers empowered under the By-Laws of the Corporation be, and each of them acting singly hereby is, authorized to execute a document effectuating a renewal of the Consulting Agreement as per the previous resolution and to execute and deliver to Carta one or more certificates for an aggregate of five hundred thousand (500,000) shares of restricted Common Stock, and that when issued and delivered in accordance with the foregoing, the aforementioned shares of restricted Common Stock shall be deemed fully paid and non-assessable.

**RESOLVED**:     That the officers empowered under the By-Laws of the Corporation be, and they hereby are, and each of them acting singly hereby is, authorized to negotiate, execute and deliver all such instruments and documents, make all such payments, make all such filings pursuant to state securities laws or otherwise and do all such other acts and things as in their opinion, or in the opinion of any of them, may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolutions; and that all such acts and things heretofore done by such officers, and any one or more of them acting alone, in connection with and in furtherance of the purposes and intent of the foregoing resolutions be, and they hereby are, ratified, confirmed and approved as the act and deed of the Corporation.

**[Signature Page Follows]**

This Unanimous Written Consent of the Sole Director in Lieu of a Special Meeting of the Board of Directors is hereby executed, effective as of the date set forth below.

Dated as of:  December 22, 2008

_____
William H. O'Dowd IV

_____
Michael Espensen

**Dolphin Digital Media, Inc.**

Unanimous Written Consent of the Sole Director in Lieu of a
Special Meeting of the Board of Directors

The undersigned, being all the directors of Dolphin Digital Media Inc., a Nevada corporation (the "**Corporation**"), do hereby waive notice and consent, pursuant to Nevada Revised Statutes, Sections 78.315 and 78.325, to the adoption of the following resolutions in lieu of holding a meeting of the Board of Directors (the "**Board**") of the Corporation with the same force and effect as if duly adopted at a special meeting of the Board called for the purpose:

NOW BE IT,

**RESOLVED:**   That it is in the best interest of the Corporation that the Corporation be and hereby is authorized to renew for one additional six (6) month term that certain Consulting Agreement by and between the Corporation and Carta de Dinero, LLC ("Carta") dated as of January 1, 2009, and to issue to Carta an additional five hundred thousand (500,000) shares of restricted Common Stock as compensation for the consulting services to be rendered pursuant thereto, such shares of Common Stock to be payable to Carta as per the terms and conditions of such Consulting Agreement as so renewed.

**RESOLVED:**   That the officers empowered under the By-Laws of the Corporation be, and each of them acting singly hereby is, authorized to execute a document effectuating a renewal of the Consulting Agreement as per the previous resolution and to execute and deliver to Carta one or more certificates for an aggregate of 500,000 shares of restricted Common Stock, and that when issued and delivered in accordance with the foregoing, the aforementioned shares of restricted Common Stock shall be deemed fully paid and non-assessable.

**RESOLVED:**   That the officers empowered under the By-Laws of the Corporation be, and they hereby are, and each of them acting singly hereby is, authorized to negotiate, execute and deliver all such instruments and documents, make all such payments, make all such filings pursuant to state securities laws or otherwise and do all such other acts and things as in their opinion, or in the opinion of any of them, may be necessary or appropriate in order to carry out the intent and purposes of the foregoing resolutions; and that all such acts and things heretofore done by such officers, and any one or more of them acting alone, in connection with and in furtherance of the purposes and intent of the foregoing resolutions be, and they hereby are, ratified, confirmed and approved as the act and deed of the Corporation.

**[Signature Page Follows]**

This Unanimous Written Consent of the Sole Director in Lieu of a Special Meeting of the Board of Directors is hereby executed, effective as of the date set forth below.

Dated as of:  June 15, 2009

_____
William H. O'Dowd IV

_____
Michael Espensen

EXHIBIT L



OFFICE OF THE GENERAL COUNSEL

804 Douglas Road
Executive Tower Building, Suite 365
Coral Gables, FL 33134

T 305.774-0407
F 305.774-0405

www.dolphindigitalmedia.com

 July 16, 2009

JUL 20 2009

NEVADA AGENCY AND
TRANSFER COMPANY

**VIA OVERNIGHT COURIER**
Nevada Agency and Transfer Company ("NATCO")
50 West Liberty Street, Suite 880
Reno, Nevada 89501
Telephone (775) 322-0626
Attn: Ms. Mary Ramsey

**RE:    Irrevocable instructions to NATCO to cancel share certificate number 2096 in the name of Carta de Dinero, LLC ("Carta," with a corporate address of 1012 N. Rowan Ave, Los Angeles, CA 90063 and a TIN of 205 77 9220) for 500,000 restricted common shares of Dolphin Digital Media, Inc. ("DPDM") to Carta in the same name, but free trading and without restrictive legend pursuant to Rule 144, the Resolution of our Board of Directors dated June 15, 2009.**

Dear Mary:

This letter of instruction is issued pursuant to the following unanimous resolutions of the Board of Directors of DPDM, duly resolved and issued (the "Resolutions," copies of which are attached hereto and deemed incorporated herein as if set forth at length):

- That certain 'Unanimous Written Consent of the Sole Director in Lieu of a Special Meeting of the Board of Directors' dated as of December 22, 2008, authorizing the issuance of five hundred thousand (500,000) common shares of DPDM to Carta de Dinero LLC ("Carta") as compensation under that certain Consulting Agreement between DPDM and Carta dated as of January 1, 2009 (as amended, and extended, the "Consulting Agreement");

- That certain 'Unanimous Written Consent of the Sole Director in Lieu of a Special Meeting of the Board of Directors' dated as of June 15, 2009, authorizing the issuance of (i) an additional five hundred thousand (500,000) common shares of DPDM to Carta as compensation under an approved extension of the Consulting Agreement (the "Extension Shares");

DPDM and Carta have discussed the appropriate effective date for the Extension Shares and have come to the agreement that, pursuant to a correct reading of the Consulting Agreement, the prior agreement of the parties and consistent with the Resolutions, the Extension Shares should be effective not as of the date of the extension of the Consulting Agreement (i.e. June 15, 2009), but rather as of the effective date of the Consulting Agreement itself (i.e. January 1, 2009).

Therefore, pursuant to the Resolutions, the Consulting Agreement, the agreement of DPDM and Carta, and with the full authorization of the Board of Directors of DPDM, the undersigned does hereby instruct NATCO to cancel share certificate 2096 in the name of Carta for 500,000 shares of restricted common stock of DPDM, and to reissue the same to Carta in the same name, free-trading and without any restrictive legend.

Once issued, the Shares should be sent via national overnight courier to:

Carta de Dinero LLC
C/O Merrill Lynch
Attn: Ramy Assaf
153 East 53rd Street, 47th Fl.
New York, NY 10022

A credit card authorization form will accompany this letter for the purpose of covering all fees relating to this request, including cancellation, issuance and stamp fees and/or all shipping related costs.

We trust that the above instructions are clear and that the Shares shall be issued forthwith upon receipt by NATCO of this letter. Please let us know immediately if there are any questions or if further information or documentation is required.

Thank you and regards,

Joshua M. Gold
Associate General Counsel
As Authorized Signer



# NEVADA AGENCY AND TRANSFER COMPANY

50 WEST LIBERTY, SUITE 880 • RENO, NEVADA 89501 • TELEPHONE (775) 322-0626
FAX# (775) 322-5623

48361

DATE 7/10/2009

DOLPHIN DIGITAL MEDIA
INC. - COMMON STOCK -
804 DOUGLAS RD SUITE 365
CORAL GABLES FL 33134

| CERTIFICATE NUMBER | NAME | NUMBER OF SHARES | CERTIFICATE NUMBER | NAME | NUMBER OF SHARES |
|---|---|---|---|---|---|
| | ORIGINAL ISSUE CANCELED | | 2095 | REDCHIP COMPANIES INC | 86000 |
| | RESTRICTED - 144 LEGEND | | | SH # 00355 | |
| | | | | 500 WINDERLEY PL STE 100 | |
| | | | | MAITLAND FL 32751 | |
| | CANCELED | | | CARTA DE DINERO LLC ISSUED | |
| | | | 2096 | SH # 00343 | 5000000 |
| | CANCELED | | | 1012 N ROWAN AVE | |
| | | | | LOS ANGELES CA 90063 | |
| | | | | RESTRICTED - 144 LEGEND ISSUED | |
| | CANCELED | | | CERTS SENT VIA FEDEX | |
| | | | | TO SHAREHOLDERS | |
| | | | | ISSUED | |

WE ACKNOWLEDGE RECEIPT OF CERTIFICATES OF STOCK OF THE ABOVE COMPANY AS FOLLOWS:

00000

48361

OUR CHARGES FOR THE ABOVE TRANSFERS ARE AS FOLLOWS:

| | | | |
|---|---|---|---|
| ISSUING | CERTIFICATES @ | EACH | 60.00 |
| OTHER CHARGES | | | 30.00 |
| | | *** | 90.00 *** PAID *** |

TOTAL AMOUNT DUE    PAID BY CHECK # 8015

586000





**OFFICE OF THE GENERAL COUNSEL**

804 Douglas Road
Executive Tower Building, Suite 365
Coral Gables, FL 33134

T: 305.774.0407
F: 305.774.0405

www.dolphindigitalmedia.com

**RULE 144 OPINION
REMOVAL OF RESTRICTIVE LEGEND
NON-AFFILIATE**

July 16, 2009

**VIA OVERNIGHT COURIER**

Nevada Agency and Transfer Company ("NATCO")
50 West Liberty Street, Suite 880
Reno, Nevada 89501
Telephone (775) 322-0626

Attn: Ms. Mary Ramsey

   **RE: Request that stock certificate number 2096 for 500,000 shares of common stock of Dolphin Digital Media, Inc. ("DPDM" or the "Company") issued to Carta de Dinero LLC ("Carta"), originally issued with restrictive legend from DPDM's duly authorized common shares, be cancelled and re-issued into the same name free-trading and without restrictive legend.**

   Dear Mary:

   Carta has requested and DPDM has agreed that we render an opinion with respect to the proposed cancellation and reissuance of certificate number 2096 for 500,000 shares of restricted common stock of DPDM (the "Certificate"), into the same name, but free-trading and without restrictive legend pursuant to Rule 144 and that certain Consulting Agreement dated as of January 1, 2009 by and between DPDM and Carta, as duly extended and renewed by the Board of Directors of DPDM on June 15, 2009 (the "Consulting Agreement").

   We understand that (i) the Shares are currently "restricted securities" within the meaning of paragraph (a)(3) of Rule 144 under the Securities Act of 1933, as amended (the "Securities Act"); and (ii) the Certificate is currently marked with a restrictive legend.

1



In connection with this opinion we have reviewed:

1.    the above-referenced Certificate;

2.    that certain Resolution of the Board of Directors of DPDM dated as of June 15, 2009 approving the extension of the Consulting Agreement for an additional six-month period (the "Resolution"); and

3.    a letter dated July 16, 2009 containing representations from the Stockholder (the "Stockholder Rep Letter").

The opinions herein expressed are based solely upon our review of the Consulting Agreement, the Resolution, the Stockholder Rep Letter, and such review of published sources of law as we deemed necessary.

Based upon and subject to the foregoing, we are of the opinion that the shares represented by the Certificate may be sold by the Stockholder without registration pursuant to Rule 144(b)(1) and that, accordingly, the restrictive legend presently appearing on the above-mentioned Certificate may be removed and any stop transfer instructions in place with respect to the Shares may be lifted and the Certificate may be re-issued to Carta in the same name, free trading and without restrictive legend.

Upon receipt by NATCO of the original Certificate representing the Shares, with appropriate transfer instructions, the transfer agent will be authorized to remove the stop transfer order on its books with respect to the Shares, if any, to cancel the Certificate and to re-issue a new certificate for the shares to Carta in the same name, free-trading and free of any restrictive legend on the certificate or of any stop transfer order on its books.

This opinion may only be relied on by the Company and by the Company's transfer agent.

Thank you and regards,

Joshua M. Gold

Associate General Counsel

2

## NON-AFFILIATE SHAREHOLDER REPRESENTATION LETTER

Date:   July 16, 2009

Nevada Agency and Transfer Company:

The undersigned Carta de Dinero LLC ("Carta"), is the owner of 500,000 restricted shares of the common stock of Dolphin Digital Media, Inc. ("Dolphin Digital Media" or "the Company") evidenced by the stock certificate number 2096 attached hereto (the "Certificate"). The purpose of this letter is to induce you to allow the issuance of a new certificate to the undersigned in lieu of the Certificate in the same name, evidencing the shares represented thereby as free-trading and without the "restrictive" legend. In order to induce you to remove this "restrictive" legend, the undersigned represents to you that:

1.   The undersigned's date of acquisition was in fact 1/1/2009 (date consideration delivered for Stock pursuant to that certain Consulting Agreement by and between Carta and the Company dated as of the same date) and;

•    the Company is a reporting company and the undersigned acquired the shares at least *six months ago*.  The last public information filed by the company was the Company's 10-Q filed on 5/15/2009;

•    to the undersigned's knowledge, the Company is not and never has been a shell issuer as described in Rule 144(i)(1).

2.   The undersigned is not now, and has not been during the preceding three months, an officer, director or more than 10% shareholder of the Company or in any other way and "affiliate" of the company as that term is defined in Rule 144(a)(1).

3.   The undersigned is unaware of any material adverse information with regard to the Company that has not been publicly disclosed.

In light of the foregoing, upon receipt of the Certificate, please issue to Carta a new certificate representing 500,000 free trading common shares of DPDM in reliance upon Rule 144 under the Securities Act of 1933 so that the shares may be free to sell without restriction and return a certificate in the same name clear of any restrictive legend based on the information provided above.  The undersigned understands and is familiar with Rule 144, agrees that the information given above may be relied upon and to indemnify you for any liability arising out of the foregoing representation.

The undersigned understands that Dolphin Digital Media will pay the fee associated with the transfer, all new certificate(s) issued, all applicable legend removal fees and all overnight courier fees.  Carta expressly requests and Dolphin Digital Media has approved that such certificate(s) be sent to our broker C/O Merrill Lynch, Attn: Ramy Assaf, 153 East 53rd Street, 47th Floor, New York, NY 10022, and to pay any and all fees associated with expediting this request.

Carta de Dinero LLC

*Arturo P. Chayra*
(Signature)

Arturo P. Chayra III

Page 1 of 1

§JS 44  (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

FILED by ___ GUE ___ D.C.

OCT 01 2009

CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Dolphin Digital Media, Inc., Dolphin Entertainment, Inc., and Dolphin Entertainment Capital, Inc. | M. Peikin, J. Gold, Bespoke Growth Partners, Casa De Dinero, NV Gay & Trsfer. Co., Merrill Lynch, Pierce, Fenner & Smith, Inc. |

**(b)** County of Residence of First Listed Plaintiff  Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Broward
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Abadin Cook -Kai E. Jacobs &/or Ramon A. Abadin, Esq.
9155 S. Dadeland Boulevard, Suite 1208
Miami, FL 33156
Telephone: 305-670-4777

Attorneys (If Known)
Unknown at this time.

09-22964

CIV-KING MAGISTRATE JUDGE BANDSTRA

**(d)** Check County Where Action Arose: ✔ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

09cv 22964- KING/BANDSTRA

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) |
|---|---|

(For Diversity Cases Only)

| II. BASIS OF JURISDICTION | | III. CITIZENSHIP OF PRINCIPAL PARTIES | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|
| ☐ 1  U.S. Government Plaintiff | ✔ 3  Federal Question (U.S. Government Not a Party) | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☒ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | | | ☐ 465 Other Immigration Actions | | |

| V. ORIGIN (Place an "X" in One Box Only) | | | | | | | Appeal to District Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|---|
| ✔ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Re-filed- (see VI below) | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 | |

| VI. RELATED/RE-FILED CASE(S). | (See instructions second page): | a) Re-filed Case ☐ YES ☐ NO     b) Related Cases ☐ YES ☐ NO |
|---|---|---|
| | | JUDGE                                              DOCKET NUMBER |

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

18 U.S.C. Section 1962 & 1964-RICO action to recover corporate assets stolen from Plaintiffs.

LENGTH OF TRIAL via   10   days estimated (for both sides to try entire case)

| VIII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23. | DEMAND $ 1,500,000.00 | CHECK YES only if demanded in complaint: JURY DEMAND: ✔ Yes ☐ No |
|---|---|---|---|

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE
October 1, 2009

FOR OFFICE USE ONLY

AMOUNT $ 350.00   RECEIPT # 1009240

10/01/09